UNITED STATES of America, Appellee,

v.

Francis CURCIO and Gus Curcio, Appellants.

No. 411, Docket 82–1282.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1982.

Decided Nov. 16, 1982.

William C. Bryson, Atty., Dept. of Justice, Washington, D.C., Alan H. Nevas, U.S. Atty., D. Conn., New Haven, Conn., for appellee.

Elaine S. Amendola, Jacob D. Zeldes, Zeldes, Needle & Cooper, P.C., Bridgeport, Conn., for appellants.

Before FRIENDLY, MESKILL and CARDAMONE, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal by Francis and Gus Curcio, who are defendants along with three other persons in a criminal prosecution under 18 U.S.C. § 892 in the District of Connecticut, is a sequel to *United States v. Curcio*, 680 F.2d 881 (2 Cir.1982), familiarity with which is assumed. In *Curcio I* we vacated an order of Judge Daly disqualifying, at the Government's request and over the Curcios' opposition, Jacob D. Zeldes and his firm, Zeldes, Needle & Cooper, P.C. (hereafter Zeldes) from appearing for either or both of the Curcio brothers, whom Zeldes had represented in a number of criminal proceedings in state and federal courts over a period of 13 years. We vacated that order on the ground that the judge had not afforded the Curcios adequate opportunity to make a knowing and intelligent waiver of their rights to conflict-free representation. We remanded the case to the district court with instructions to afford the the Curcios the opportunity previously denied.

The Facts and the Decision Below

On remand, the district court held hearings on July 16, July 19, and July 27, 1982. The judge began the Friday, July 16 hearing by eliciting that both Francis and Gus Curcio knew of this court's ruling in *Curcio I* and had discussed it with Zeldes. The judge made clear that he was going to review "certain areas" and that the Curcios were then to have the weekend to discuss them further, with the "absolute right" to consult outside counsel. Both Curcios acknowledged understanding this. Judge Daly then asked whether both understood "that there are certain risks that adhere to both of you using the same lawyer", adding "[Y]ou may not agree that it's very risky, but there are certain risks that adhere to that". Both Curcios said they understood. They also stated they had discussed some of these risks with Zeldes and had also discussed with him the nature of the Government's proof insofar as this was available. Each also acknowledged understanding that he was entitled to raise defenses which might be adverse to the other and that with the same counsel this was "going to be virtually impossible." They understood that Zeldes could not "make a recommendation" or "use information" favorable to one but unfavorable to the other without the consent of both. When the judge referred to the phrase in Judge Kearse's opinion for this court, 680 F.2d at 887, characterizing the dangers of dual representation as "ubiquitous", which he characterized as meaning "everywhere", the Curcios stated that they and Zeldes had discussed this. Zeldes interjected that he could not be certain he had "thought of every conceivable situation that will arise," and the judge said that was going to be his next question. After ex-

plaining that no lawyer could anticipate the precise course which a trial would take, he asked whether the Curcios understood that if some unexpected turn of events should cause one or the other to want to discharge Zeldes, no delay in the trial would be permitted. Both brothers said they understood. The judge next put the case of a prosecution witness whom Zeldes might think could be cross-examined to the advantage of Francis but to the disadvantage of Gus or *vice versa*. He asked if they realized that in such a situation Zeldes would be "hampered from free and independent representation of at least one" of them and that even if they both agreed as to the course Zeldes should take, one of them might be compromising what would be in his own best interests; the Curcios said they understood. Judge Daly put the classic case of one defendant wishing to testify and the other not, Gus said it was his understanding that Zeldes couldn't prevent him from testifying. The judge answered that this was so, but that Gus' decision to testify might nevertheless place Zeldes in a position where he could no longer represent him. Gus said he understood that this could happen and also that if Zeldes had to withdraw or Gus had to fire him, no delay in the trial would be tolerated. After reverting to the case of the witness favorable to one defendant but unfavorable to the other, the judge went on to discuss plea negotiations. He inquired whether they understood that if only one wished to plead guilty, it "could be very difficult for Mr. Zeldes to represent that defendant in those negotiations ...". The Curcios said they understood. After elaborating still further on the theme of the witness favorable to one Curcio but unfavorable to the other, which Zeldes agreed should be further explored over the weekend, inquiring whether the Curcios wished to ask him any questions, eliciting that the Curcios understood that Zeldes would have to share all communications from the Government with both of them, and obtain-

ing negative answers to his inquiry whether the Curcios' responses to his questions or their desire to waive the right to separate counsel had been induced by promises or threats of any kind, the judge adjourned the hearing until July 19. He asked Zeldes to discuss the problem of joint representation with the Curcios again and requested them to consult with another lawyer or lawyers if they wished. At the conclusion of the hearing, the Government informed the court that, in light of our opinion in *Curcio I,* it had no further opposition to Zeldes' representing just one of the Curcio brothers.

When the hearing resumed on July 19, the court announced its intention to examine the defendants one at a time and to have Francis, who was in custody, "kept downstairs until we have done Gus Curcio." Zeldes objected without success that each defendant was entitled to hear the colloquy with the other. We can omit the court's discussion with Gus since only Francis' waiver of the right to conflict-free representation was found to be not knowing and intelligent.[1] The judge began the discussion with Francis by reventilating a problem discussed at the July 16 hearing, namely, whether one of the Curcios could "fire" Zeldes if unexpected problems should arise during the trial. The judge clarified his position as being that he would be the one to decide whether Zeldes should be removed from the case; Francis said he understood this. The judge then ascertained that Francis was feeling better than he had been on Friday and that he had conferred over the weekend with Zeldes and with his brother. In contrast to Gus, however, he had not conferred with outside counsel, explaining "I don't feel the need to, 'cause I want Mr. Zeldes for my counsel." The following colloquy then ensued:

The Court: Now, having thought about the matter and having consulted with Mr. Zeldes, is it still your wish that Mr. Zeldes represent you in this case?

1. The judge nowhere expressly found that Gus' waiver was knowing and intelligent. But he indicated on several occasions that he was more satisfied with Gus' answers than with

Francis'. In this regard it should be noted that after disqualifying Zeldes from representing both Curcios, he accepted Gus' waiver of any objections to Zeldes' representation of Francis.

Def. F. Curcio: Yes, your Honor.

The Court: And that he also represent your brother?

Def. F. Curcio: Yes, your Honor. Yes, sir.

The court then endeavored to have Francis tell him what it was he was waiving by having Zeldes represent both him and his brother. The discussion continued:

Def. F. Curcio: Waiving, that he could tell my brother anything that goes on in the case.

The Court: Do you see any other matters that might be risky to you in having him represent two people in this case?

Def. F. Curcio: No, I don't see no—I don't see nothing.

The Court: What about if he can't cross-examine a witness the way he might want to for you because he's representing Gus?

Def. F. Curcio: We go into that, we know what we're doing if we go into that.

The Court: You see that potential risk since you want something done that can't be done because it may be against Gus' interests to do it?

Def. F. Curcio: I don't think it's a risk.

The Court: You don't think it's a risk?

Def. F. Curcio: It may be, but, I mean, you know, I know what we're doing. We know what we're doing. I know what I'm doing.

The Court: All right. What about the risk that it might shape up in, you know as much as or as little as any of us know about this case, or think we know about it, you're a person of experience, as is your brother and, of course, Mr. Zeldes has had considerable experience in the courtroom, and I have had a little bit here and there, and things can happen, as I'm sure you understand, that nobody can anticipate.

Def. F. Curcio: I understand that.

After this exchange the court reverted yet again to its example of a witness favorable to one brother but unfavorable to the other, in this hypothetical favorable to Francis but bad for Gus, and asked whether Francis saw that as a risk. Francis answered, "It would be a risk if he had another lawyer, too." The judge pointed out that this would be a risk for Gus but not for Francis. The latter responded, "I don't think it's a risk." He was also willing to take the risk that because of Zeldes' representation of both brothers the jury might not be able to hear things it was entitled to hear. When asked to define "effective assistance of counsel", he said "[i]t means that counsel's assisting your case". He was willing to take the risk that Zeldes might be precluded from taking a step for his benefit because it would be detrimental to Gus. He understood that to that extent he might be waiving the effective assistance of counsel.

The judge then asked Francis to tell him what conflicts he could think of that Zeldes might face as a lawyer representing both brothers. Francis did not think there would be any. Judge Daly next ascertained that Francis understood he was waiving the right to have Zeldes tell him confidences imparted by Gus and withhold from Gus confidences imparted by him. After Francis declined its invitation to ask questions, the court repeated some of the questions asked at the first hearing—whether Francis understood that Zeldes could make no recommendation for his benefit that was adverse to Gus'; whether he understood that Zeldes could use any information furnished in confidence only if both brothers agreed, and that Zeldes' "judgment as a lawyer" would thus be curtailed; whether Francis understood that the court "wouldn't even contemplate" allowing Zeldes' joint representation if the brothers had not insisted on it insofar as they had the right to do. Francis' uniform answer was "Yes." Next, the court, at Zeldes' request, explained to Francis that if circumstances later required that Zeldes be relieved as counsel for one of the Curcios, the court might decide he had to be relieved as to both. After Francis declined yet another invitation to address questions to the court, the judge, at the Government's request endeavored to elicit a narrative answer from Francis as to "[w]hat, if anything, do you see by way of potential conflicts that Mr. Zeldes might

have by virtue of the fact that he's going to be representing, if I allow him to, both of you and Gus in the trial of this case." Francis answered, "I don't see no conflicts."

The court then asked Zeldes whether he had gone over with his clients the areas of possible conflicts as he could presently foresee them. He had. Zeldes had likewise satisfied himself that each brother knew that he had an absolute right to separate counsel. While he had not used the phrase "effective assistance of counsel", he had made it clear that each brother was entitled to conflict-free representation and was giving up that right by choosing the same lawyer. The court then took a recess to enable Zeldes to confer further with his clients. When the hearing resumed, Zeldes reported that he had advised Francis that joint representation involved a risk of conflicts that nobody could presently foresee. Acknowledging that some of Francis' answers had not been "crystal clear", Zeldes asked if the court had any further inquiries. The judge said he would hear anything that Francis wished to say. The latter began by stating that he had told Zeldes of his understanding that "there's conflict of interest, and like that, and I'm willing to waive any—". At this point the judge inquired "What do you foresee as possible areas?" Francis began with the instance, "It could be he could put one witness on for one, not the other," to which the court responded "Anything else?" Francis answered, "A plea bargain for one, not the other. But, like I said, I'm willing to waive anything like that."

The court then requested briefs, indicating that its "preliminary thinking" was "that there is not a knowing and understanding waiver by Mr. Francis Curcio. It's an intentional waiver, I don't have any doubt about that, but I don't think it's knowing and understanding." Zeldes expressed concern that the record with respect to Francis "does not read as well, as

to his understanding, as possible" and sought an opportunity to improve it. After a further conference between Francis and Zeldes, the following occurred:

Def. F. Curcio: Mr. Zeldes—we're just going over a few things, like, I want to explain, I understand this conflict of interest, like cross-examining of witnesses, bringing up final arguments, I understand all that, and I'm willing to waive all them things.

The Court: What else do you understand you will be waiving?

Def. F. Curcio: If he can be able to bring me on the stand, maybe not my brother, or vice versa. One and not the other.

The Court: Anything else presently?

Def. F. Curcio: I have a record and my brother doesn't.

The Court: Anything else?

Def. F. Curcio: No, that's about all.

The Court: Notwithstanding, it's your choice?

Def. F. Curcio: Yeah. Excuse me. My choice is to have Mr. Zeldes as my lawyer. That's why I'm coming up to explain that to you.

On July 27, 1982, the court announced its decision. The "preliminary thinking" had hardened. Judge Daly found and concluded that Francis had not made a knowing and understanding waiver, although he believed that Francis "intends to waive" and that "any waiver he purported to put on the record was voluntary." He added that he had "observed in the course of the hearings ... the demeanor and appearance" of Francis and that this was "part of the reason" for his ruling, although he was not alluding to Francis' weight and took at face value the latter's statement that he felt all right. The court expressly declined to follow the course proposed in defendants' memorandum which we quote in the margin.[2] Having been advised by Zeldes that, in light of his ruling, the brothers would

---

2. The Court has asked each defendant if either had any question of the Court. Defendants now ask the Court to answer this question: If the waiver of either defendant isn't considered valid, what must each understand, do or say in

order to have counsel of their choice? If this question is answered by the Court to defendants, they will be able to make their position clear.

prefer that Zeldes should represent Francis rather than Gus, the judge proceeded to conduct a further colloquy with the latter. He determined that Gus had validly waived any objection to Zeldes' representation of Francis. The court then ruled that while Zeldes could continue to represent Francis, Gus had to retain separate counsel. The brothers have appealed from this ruling. On August 10, 1982, and September 20, 1982, this court denied appellants' motions for a stay. But after studying the briefs and hearing oral argument, we reconsidered the matter and entered a stay on September 24, 1982. We now reverse.

### Appealability

In *Armstrong v. McAlpin,* 625 F.2d 433, 440–41 (2 Cir.1980) (en banc), vacated on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981), we reaffirmed our rule, see *Fleischer v. Phillips,* 264 F.2d 515, 517, *cert. denied,* 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959), that orders disqualifying counsel in civil cases are appealable under the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–1226, 93 L.Ed. 1528 (1949). See, *accord, Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (7 Cir.1982). In *United States v. Cunningham,* 672 F.2d 1064, 1066 n.1 (2 Cir.1982), we applied that rule to an order disqualifying counsel in a criminal case. Pointing to the absence of discussion in *Cunningham* of a possible distinction between civil and criminal cases, to the contrary holding of the Ninth Circuit in *United States v. Greger,* 657 F.2d 1109 (1981), and to the recent decision of the Supreme Court in *United States v. Hollywood Motor Car Co.,* —— U.S. ——, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982), the Government invites us here to reconsider the appealability of orders disqualifying criminal defense counsel.[3]

In *Greger,* while expressing no opinion on the appealability of disqualification orders in civil cases, 657 F.2d at 1113, and reserving the appealability of orders disqualifying government counsel in criminal cases, *id.* at n.1, the Ninth Circuit, *per* Judge Duniway, concluded that an order disqualifying criminal defense counsel can be effectively reviewed on appeal from a final judgment of conviction and therefore fails the third part of the "collateral order" test set forth in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978).[4] 657 F.2d at 1111–13. Because prejudice was thought to be presumed from an erroneous disqualification of criminal defense counsel, the *Greger* court reasoned that review on appeal after a final judgment of conviction is fully adequate to protect a defendant's right to counsel of his choice. *Id.* at 1113.

The Government urges that the reasoning and result in *Greger* are buttressed by the recent decision in *Hollywood Motor Car.* The Court there emphasized that the policy against piecemeal review is at its strongest in criminal cases and pointedly noted that the *Cohen* doctrine has been applied to interlocutory criminal appeals on only three occasions: in *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) (order fixing bail), *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (order denying motion to dismiss indictment on double jeopardy grounds), and *Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (order denying motion to dismiss indictment on ground that it violates the Speech or Debate Clause of the Constitution, Art. I, § 6). Finding that defendants' claim of prosecutorial vindictiveness is "more analogous" to the speedy trial claim held unappealable in *United States v. MacDonald,* 435 U.S. 850, 860, 98 S.Ct. 1547,

---

**3.** Other circuits have found orders like that here at issue to be appealable. *See, e.g., United States v. Flanagan,* 679 F.2d 1072, 1072 (3 Cir.1982); *United States v. Garcia,* 517 F.2d 272, 275 (5 Cir.1975).

**4.** "To come within the 'small class' of decisions excepted from the final-judgment rule by *Co-*

*hen,* the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand, supra,* 437 U.S. at 468, 98 S.Ct. at 2457 (footnote omitted).

1552, 56 L.Ed.2d 18 (1978), than to these three, in that it is not "effectively unreviewable on appeal from a final judgment," 102 S.Ct. at 3084, quoting *Coopers & Lybrand, supra,* the Court held that an order denying a motion to dismiss an indictment on grounds of prosecutorial vindictiveness does not fall within the collateral order exception.

While Judge Duniway's opinion in *Greger* has considerable force, particularly in light of the strictures in *Hollywood Motor Car,* its linchpin is the assumption that prejudice is to be presumed from an erroneous disqualification of defense counsel in a criminal case. Judge Duniway conceded that if prejudice were not presumed the defendant's burden on appeal would be "insurmountable" and the disqualification order " 'effectively unreviewable' ". *Greger, supra,* at 1113. He read the cases in his own circuit, however, as firmly establishing such a presumption.

■ The Government does not here argue that prejudice would be presumed in the event that Gus, who alone in its view would have standing to raise an erroneous disqualification claim,[5] is convicted. Indeed, we would expect the Government vigorously to dispute any presumption of prejudice in a case such as this. Rather, the Government suggests only that if we defer review until after judgment we "will have a more complete record on which to evaluate the disqualification issue than is available at this juncture." Brief at 13. It is far from clear, however, how our ability to determine whether or not Francis Curcio knowingly and intelligently waived his right to conflict-free representation will be improved after trial. More important, there are indications in our cases that prejudice might not be presumed from the erroneous disqualification of defense counsel. *See, e.g., Armstrong v. McAlpin, supra,* 625 F.2d at 440–41. If so, Gus might well be

required on appeal to show that he would not have been convicted had he not been deprived of his chosen counsel. This burden would be well-nigh "insurmountable," see *Armstrong, supra,* 625 F.2d at 441; *Greger, supra,* 657 F.2d at 1113, and thus the order disqualifying Zeldes would be "effectively unreviewable on appeal from a final judgment." While recognizing that the point is not free from difficulty and that we might desire to reconsider it, necessarily in en banc proceedings, if *Greger* should attract a following or if there should be further signals from the Supreme Court, we shall therefore adhere to our ruling in *Cunningham* that an order disqualifying defense counsel in a criminal case is appealable.

### The Standard of Review

Appellants and the Government sharply disagree over the nature of the trial judge's determination that Francis Curcio's waiver of his right to separate and conflict-free representation was not knowing and intelligent, and consequently over the proper standard of appellate review. On the one hand, the Government stoutly asserts that the determination is a finding of fact and that while the Federal Rules of Criminal Procedure contain no counterpart to the "unless clearly erroneous" rule of F.R.Civ.P. 52(a), the courts have applied that same standard of review in criminal cases. See *Campbell v. United States,* 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501 (1963); *United States v. Cruz,* 581 F.2d 535, 540 (5 Cir.1978) (en banc); *Jackson v. United States,* 353 F.2d 862, 864–865 (D.C.Cir. 1965); *United States v. Page,* 302 F.2d 81, 83–86 (9 Cir.1962). It cites a multitude of cases for the proposition that "[d]istrict court findings on the issue of waiver have routinely been held to be findings of fact which are subject to review under the clearly erroneous rule,"[6]—particularly   ...

---

5. The Government suggests that Francis has no standing to pursue the instant appeal since he is being represented by counsel of his choice and hence that only Gus could raise the issue on appeal from a judgment of conviction. We find it unnecessary to pass upon this since the

Government concedes Gus' standing to take the present appeal, although questioning our jurisdiction over it, and therefore does not ask us to rule with respect to Francis' standing.

6. The Government cites two of these cases, *United States v. Quinones,* 613 F.2d 47 (3 Cir.),

where, as in this case, the finding is based in part on the district court's observation of a witness's demeanor in court."

Appellants argue with equal fervor that the district court's decision embodies a conclusion of law. They rely particularly on the portion of the opinion in *Brewer v. Williams,* 430 U.S. 387, 403–04, 97 S.Ct. 1232, 1241–1242, 51 L.Ed.2d 424 (1977) (the "Christian burial" case), wherein the Court said:

> ... the question of waiver was not a question of historical fact, but one which, in the words of Mr. Justice Frankfurter, requires "application of constitutional principles to the facts as found ...." *Brown v. Allen,* 344 U.S. 443, 507 [73 S.Ct. 397, 446, 97 L.Ed. 469] (separate opinion).

The appellants are more nearly right than the Government. In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Court examined the distinction between fact and law in the context of federal habeas review of state convictions. The Court distinguished "issues of fact," by which it meant "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators' ", from "so-called mixed questions of fact and law, which require the application of a legal standard to the historical fact determinations." 372 U.S. at 309 n.6, 83 S.Ct. at 755 n.6, quoting *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (opinion of Frankfurter, J.). This distinction has been carried over to the interpretation of 28 U.S.C. § 2254(d). In its recent decision in *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982), the Court held that only findings of "historical fact" are entitled to the statutory presumption of correctness. See also *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980) (state court determination that attorneys had not engaged in multiple representation "is a mixed determination of law and fact that requires the application of legal principles to the historical facts of the case" and is therefore not protected by § 2254(d)).

This same distinction between questions of "basic, primary, or historical fact" and questions of law, mixed or pure, applies equally with respect to our direct review of district court decisions in criminal cases. Even if, as the Government asserts, the

---

*cert. denied,* 446 U.S. 937, 100 S.Ct. 2155, 64 L.Ed.2d 790 (1980), and *United States v. Hobson,* 672 F.2d 825 (11 Cir.1982), as having addressed the same issue presented here.

In *Quinones* a district court determination that a waiver of conflict-free representation was not knowing and intelligent was indeed reviewed under a clearly erroneous standard. But the choice of that standard, and the decision itself, were doubtless influenced by the district judge's express finding that "a potential conflict of interest existed," 613 F.2d at 48, assuming that he was taken to have meant by this something more than the conflict theoretically present in every case of joint representation. For the Third Circuit's rule is that a district court has power to disregard an otherwise valid waiver whenever it determines that joint representation might constitute a breach of professional ethics or invite disrespect for the integrity of the court. See *United States v. Dolan,* 570 F.2d 1177 (3 Cir.1978) (district court need not accede to waiver in face of "actual serious conflict") and *United States v. Flanagan,* 679 F.2d 1072 (3 Cir.1982) (district court may decline to accept waiver if conflict is "likely to arise" but not if "highly speculative").

The cases in this circuit recognize no such power. See *In re Taylor,* 567 F.2d 1183, 1191 (2 Cir.1977) (district court is "without power" to obstruct choice if right to conflict-free representation is knowingly and intelligently waived) and *United States v. Curcio, supra,* 680 F.2d at 887–88. *United States v. Bernstein,* 533 F.2d 775 (2 Cir.1976) is not to the contrary. The district court's disqualification of defense counsel was upheld there on the grounds, among others, that defendant's waiver was "not without strings" and that the conflict was actual.

*Hobson* affords even less comfort to the Government. The disqualification order there was based not on an asserted conflict of interest but rather on the expectation that government witnesses would testify at trial that Hobson's chosen counsel had contemporaneous knowledge of the very drug-importation activities for which Hobson was to be tried. The court held that such a defect was not waivable "because the ethical violation involves public perception of the lawyer and the legal system rather than some difficulty in the attorney's effective representation of Hobson." 672 F.2d at 829.

"clearly erroneous" rule is applicable in criminal cases, only findings of "fact" as defined in the manner of *Townsend* and its progeny would thereby be protected. *Cf. Neil v. Biggers,* 409 U.S. 188, 193, n.3, 93 S.Ct. 375, 379 n.3, 34 L.Ed.2d 401 (1972) (the two-court rule not applicable "where the dispute . . . is not so much over the elemental facts as over the constitutional significance to be attached to them").

In the present case there is no dispute as to the relevant "historical facts". The district judge did not have to weigh conflicting testimony or assess the credibility of witnesses. There is no dispute whatever as to what the judge, Francis, or others said at the July hearing; both sides accept the transcript as accurately portraying what occurred, and we shall discuss the judge's reference to Francis' demeanor in the following section. This leaves only the question whether the judge applied too stringent a waiver standard (a question of law) or misapplied the correct standard (a mixed question). In either event we have full powers of review,[7] even though our exercise of them is to some extent impeded by the judge's failure to specify in what respect he found Francis' waiver to have been deficient.

**The Merits**

The first step toward decision in this case is to recognize that we are dealing not with a garden-variety case of "waiver", say, of the privilege against self-incrimination, but rather with a conflict of two constitutional rights, to wit, the right of a criminal defendant to be represented by counsel of his own choice and the right of such a defendant to counsel whose effectiveness is unimpaired by divided loyalty. What makes the case especially troubling is that the latter right is asserted not by the defendants, who wish to walk away from it, but rather is asserted against them by the Government, whose appropriate concern is simply in avoiding interruption of the trial and in obtaining convictions free from appreciable threat of successful attack. Mere statement would seem sufficient to suggest that a close case should be resolved in favor of those whose liberty is at stake.[8]

The constitutional origin of each of these warring rights is well settled. The right to be represented by counsel of one's choosing has long been regarded as part and parcel of the "fundamental" right to be heard through counsel. See *Powell v. Alabama,* 287 U.S. 45, 53, 68–69, 53 S.Ct. 55, 58, 63–64, 77 L.Ed. 158 (1932). Even during the era of *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252,

---

**7.** Our belief that the trial judge's determination here is independently reviewable is fortified by the Supreme Court's decision in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). There the state trial judge, "[a]fter consideration of Faretta's answers, and observation of his demeanor," had ruled that he had "not made an intelligent and knowing waiver of his right to the assistance of counsel." 422 U.S. at 810–11, 95 S.Ct. at 2529. The Supreme Court, undaunted by the demeanor reference, undertook an independent review of this ruling and concluded that Faretta's waiver was knowing and intelligent. Reading the state court trial record for itself, the Court found that Faretta had declared his desire to represent himself "clearly and unequivocally," that he was "literate, competent, and understanding," that he was "voluntarily exercising his informed free will," and that he had been adequately warned by the trial judge regarding the perils of self-representation. The Court further found that the trial judge had in effect set the waiver standard too high by demanding a showing of "technical legal knowledge" not necessary for

Faretta's waiver of counsel to be knowing. 422 U.S. at 835–36, 95 S.Ct. at 2541.

**8.** It seems to us that a case where a defendant is vigorously asserting his right to counsel of his choosing is not truly a case of "waiver" at all; it is, rather, a decision to assert one constitutional right rather than another. See *Kaplan v. Bombard,* 573 F.2d 708, 714 (2 Cir.1978). *Cf. United States ex rel. Konigsberg v. Vincent,* 526 F.2d 131, 132–34 (2 Cir.1975), *cert. denied,* 426 U.S. 937, 96 S.Ct. 2652, 49 L.Ed.2d 388 (1976) (assertion of right of self-representation). This is more than a semantic quibble; characterizing the Curcios' choice as one of 'waiver' of the right to conflict-free representation invites judicial scrutiny that is excessively paternalistic and insufficiently protective of the competing right to counsel of choice. However, inasmuch as *Curcio I,* like other opinions on this subject, framed the issue for the district court on remand as one of waiver and both parties have argued in those terms, we will use the conventional terminology in the discussion that follows.

86 L.Ed. 1595 (1942), the Court stamped the right of a criminal defendant "to be heard through his own counsel" as "unqualified." *Chandler v. Fretag,* 348 U.S. 3, 9, 75 S.Ct. 1, 4, 99 L.Ed. 4 (1954). And we have consistently said that a defendant who retains counsel has a right "of constitutional dimensions" to the counsel of his choice. See *United States v. Sheiner,* 410 F.2d 337, 342 (2 Cir.), *cert. denied,* 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969); *United States v. Wisniewski,* 478 F.2d 274, 285 (2 Cir.1973); *United States v. Cunningham, supra,* 672 F.2d at 1070. While not absolute, this right "should not be unnecessarily obstructed by the court." *United States v. Sheiner, supra,* 410 F.2d at 342.

The constitutional pedigree of the right not to have a court impose representation involving a conflict of interest is no less impressive. In the seminal case of *Glasser v. United States* the Supreme Court held that the 6th Amendment guarantee of assistance of counsel "contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942). This right has since been reaffirmed in *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) and *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). However, in each of these cases the right to conflict-free representation arose in a context very different from that presented here, namely, that of an attack on conviction based on an ineffective assistance claim.[9] Notwithstanding this difference, however, the facts of *Glasser,* notably the affirmance of the conviction of Glasser's co-defendant Kretske who had invited the

joint representation of himself and Glasser, and certain statements in both *Glasser* and the other opinions are pertinent to our inquiry here.

■ The first of these is the Chief Justice's statement for the Court in *Holloway, supra,* 435 U.S. at 482–83, 98 S.Ct. at 1177–1178:

One principle applicable here emerges from *Glasser* without ambiguity. Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Glasser v. United States, supra,* [315 U.S.] at 92 [62 S.Ct. at 475] (dissenting opinion).[5]

---

[5] By inquiring in *Glasser* whether there had been a waiver, the Court also confirmed that a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests. 315 U.S., at 70, 62 S.Ct., at 464. In this case, however, Arkansas does not contend that petitioners waived that right.

The second is Justice Powell's statement for the Court in *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718:

*Holloway* reaffirmed that multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest. See 435 U.S., at 482 [98 S.Ct., at 1177]. Since a possible conflict

---

9. In *Glasser* joint representation had been imposed by the trial judge over the objection of defendant Glasser. The Court reversed Glasser's conviction because the joint representation had adversely affected his defense, but affirmed the conviction of a codefendant, Kretske, who had invited the joint representation. In *Holloway* the trial judge had refused to appoint separate counsel for three indigent codefendants despite their counsel's timely and repeated assertions that their interests conflict-

ed. The Court reversed the convictions, declining in the circumstances to require a showing of prejudice. In *Cuyler* the defendants had retained joint counsel and had raised no objection to the multiple representation until after trial. The Court held that where no timely objection is lodged a claim of ineffective assistance requires a showing that an "actual conflict adversely affected [the joint counsel's] performance." 446 U.S. at 348, 100 S.Ct. at 1718.

inheres in almost every instance of multiple representation, a defendant who objects to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. But unless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel. Such a presumption would preclude multiple representation even in cases where " '[a] common defense ... gives strength against a common attack.' " *Id.*, at 482–483 [98 S.Ct., at 1178], quoting *Glasser v. United States,* 315 U.S. 60, 92 [62 S.Ct. 457, 475, 86 L.Ed. 680] (1942) (Frankfurter, J., dissenting).

We find it important that even a defendant who objects to joint representation, much less a defendant who strenuously seeks it, is not entitled to an automatic reversal. We likewise find significance in the Court's endorsement of Justice Frankfurter's observation in his *Glasser* dissent that a defendant may have a substantial and appropriate interest in joint representation.[10] The right claimed by the Curcios thus is not merely

the right to have their defense conducted by a lawyer who has long represented them, in whose skill and judgment they have confidence, important as that right is, but the right to present their defense in what they have reasonably concluded to be the most effective fashion.

Nothing in *Curcio I* suggests that the assertion of these rights should be subjected to a degree of scrutiny that would drastically curtail them; indeed the decision reversed the district court for having terminated its F.R.Crim.P. 44(c) inquiry too abruptly.[11] Judge Kearse expressly recognized that, 680 F.2d at 887:

Notwithstanding the considerable dangers, however, the teaching of the Supreme Court in *Glasser, Holloway,* and *Cuyler* is that defendants may, if they act with their eyes open, elect to be represented jointly by a single attorney.

Turning to the question of what constitutes a knowing and intelligent waiver, she said, 680 F.2d at 888–89:

If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of

**10.** The full text of Justice Frankfurter's observation was, 315 U.S. at 92, 62 S.Ct. at 475:

A conspiracy trial presents complicated questions of strategy for the defense. There are advantages and disadvantages in having separate counsel for each defendant or a single counsel for more than one. Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack.

**11.** This rule, which became effective December 1, 1980, provides:

Joint Representation. Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

The Government has not urged that Rule 44(c) calls for a result different from what we would otherwise reach. In any event such contention would be foreclosed by *Curcio I, supra,* 680 F.2d at 888:

The recently adopted Fed.R.Crim.P. 44(c), set forth at note 1, *supra,* does not eliminate the defendant's power to waive his right to be represented by a conflict-free attorney. While the rule imposes on the trial court the duty to make prompt inquiries and to advise the jointly represented defendants as to their rights to separate representation, it does not forbid joint representation. It merely requires that where a conflict may arise "the court shall take such measures as may be appropriate to protect each defendant's right to counsel." Given the constitutional dimension of the defendant's right to counsel of his own choosing, if the defendant makes a knowing and intelligent election to pursue that right in preference to his right to an attorney of undivided loyalty, disqualification would *not protect* the Sixth amendment right that the defendant asserts and would not be "appropriate."

this information, and if he states clearly and unequivocally, see *United States v. Bernstein, supra,* 533 F.2d at 788, that he nevertheless chooses to hazard those dangers, we would regard his waiver as knowing and intelligent and allow his choice to "be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Faretta v. California, supra,* 422 U.S. at 834 [95 S.Ct. at 2540], (quoting concurring opinion of Brennan, J., in *Illinois v. Allen, supra,* 397 U.S. [337] at 350–51 [90 S.Ct. 1057 at 1064, 25 L.Ed.2d 353].[12]

Indeed, we think that *Faretta* is highly relevant. The choice of joint representation, like that of self-representation, is at once strategic and moral. Defendants who elect joint representation have decided that in their particular case its advantages outweigh its hazards. They have also committed themselves to one another, choosing to assume a common "position before the law", *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942). To be sure, the defendants' choice of joint representation, like that of self-representation, may sometimes seem woefully foolish to the judge. But the clear thrust of *Faretta* is that the choice is mainly theirs; the judge, much less the prosecutor, is *not* to assume too paternalistic an attitude in protecting the defendant from himself. *Cf. Michigan v. Mosley,* 423 U.S. 96, 108–09, 96 S.Ct. 321, 328–329, 46 L.Ed.2d 313 (1975) (White, J., concurring) ("Unless an individual is incompetent, we have in the past rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case."). The reasons for this are two. First, defendants, despite their lack of legal sophistication, are sometimes in a better position than the judge to evaluate the advantages and disadvantages of joint representation. After all, they alone know what type of defense they will put on. Second, the defendants' choice is to be honored out of respect for them as free and rational beings, responsible for their own fates. It is the defendants, not the judge or prosecutor, who "will bear the personal consequences of a conviction." *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540. The resolve of the Curcio brothers to stand before the law together, with the same lawyer, no less than Faretta's resolve to stand before the law entirely alone, is worthy of constitutional protection.

■ The Third Circuit's attempt to distinguish *Faretta* on the basis that *Faretta* found that the right to self-representation

---

12. Although *Curcio I* is of particular importance as this court's last pronouncement on the subject and as constituting the law of the case, we see nothing in earlier decisions of this court cited by the Government which could be taken as adopting a more stringent rule. The most important distinction is that none involved a situation like that here where the defendants insisted on joint representation and there was thus a real clash of constitutional rights. *United States v. De Berry,* 487 F.2d 448, 453 (2 Cir.1973), held only that the situation there presented, where one of the jointly represented defendants gave testimony incriminating the other, was one in which "the trial court should have conducted the most careful inquiry to satisfy itself that no conflict of interest would be likely to result and that the parties involved had no valid objection." Judge Oakes' statement in *United States v. Mari,* 526 F.2d 117, 120–21 (2 Cir.1975) that "it should be only after the most searching inquiry on the part of the court and in those exceptional circumstances where a conflict is not within the realms of reasonable foreseeability that dual representa-

tion by defense counsel should be permitted", was, as he said, a proposal, made in a concurring opinion, and not the holding of the court. Judge Lumbard's observations in *United States v. Carrigan,* 543 F.2d 1053, 1058 (2 Cir.1976), that "there will be cases where the court should require separate counsel to represent certain defendants despite the expressed wishes of such defendants" and that "[t]he right to effective representation by counsel whose loyalty is undivided is so paramount in the proper administration of criminal justice that it must in some cases take precedence over all other considerations, including the expressed preference of the defendants concerned and their attorney" were likewise made in a concurring opinion; moreover, there is nothing to indicate that Judge Lumbard would apply so stringent a remedy in every case. In *Camera v. Fogg,* 658 F.2d 80, 89 (2 Cir.), *cert. denied,* 454 U.S. 1129, 102 S.Ct. 981, 71 L.Ed.2d 117 (1981), the court found that the defendants had received no meaningful explanation of the problems of multiple representation—surely not the situation here.

is an independent right "which does not arise mechanically from a defendant's power to waive the right to the assistance of counsel", see *United States v. Dolan, supra,* 570 F.2d at 1183, is unpersuasive. The right to be represented by counsel of one's choice likewise does not arise mechanically from a defendant's right to waive the assistance of counsel. Indeed, the case seems *a fortiori* to *Faretta,* since the Sixth Amendment says nothing about the right to self-representation whereas the right to counsel of one's choice is part and parcel of the right to the assistance of counsel expressly guaranteed. To be sure, that right is not unqualified. A defendant cannot insist upon it when it is apparent that its exercise will unduly delay a trial, see *United States v. Cicale,* 691 F.2d 95 at 106 (2 Cir.1982), or inflict damage upon other defendants or create an actual conflict. Save for such cases, however, it is enough that, as the Court said in *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541, the defendant "should be made aware of the dangers and disadvantages ... so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' *Adams v. United States ex rel. McCann,* 317 U.S. at 279 [63 S.Ct. at 241]."

■ The judge's cryptic remarks at the July 27 hearing leave us completely in the dark as to why he concluded that Francis' waiver was not knowing and understanding. There is no dispute that Francis has the basic intellectual capacity to make a knowing and intelligent waiver. Moreover, as the judge himself recognized, Francis is "a person of experience"; what he lacks in technical legal knowledge he unfortunately makes up for in worldly wisdom born of a long series of indictments, plea negotiations, and trials in the federal and state courts of Connecticut.[13] There is no suggestion that Francis' waiver was induced by

or designed to please his younger brother to whom the indictment assigned a more minor role in the conspiracy. Indeed, the court expressly found that the waiver was voluntary.

Further, Francis surely had been fully informed of the hazards of joint representation. The judge, as we have seen, had gone over the dangers in the greatest detail on several occasions. At no time did Francis express any confusion about joint representation. Contrast *United States v. Donahue,* 560 F.2d 1039, 1042 (1 Cir.1977) (defendant had said "I'm really vague about how that mechanism of conflict of interest works. [My counsel] seems to think that it's fine and I would go along with that, but I'm a little bit vague about just what the conflict of interest might involve."). He repeatedly assured the judge that he did not see any real threat of a conflict in the Curcios' defense but that he was prepared to take the risk that such a conflict might unexpectedly surface. In short, Francis knew that he had a right to separate and conflict-free representation, knew that in foregoing that right he was running the risk that his defense might be compromised in unforeseeable ways, and knew that, if convicted, he would not be heard to complain that his defense had been so compromised. He had had ample time to mull the matter over, to confer with his brother and Zeldes, and to consult outside counsel had he wished.

Something, however, is sought to be made of Francis' rather poor performance when asked to make a narrative statement of the risks of joint representation, as recommended in *United States v. Garcia,* 517 F.2d 272, 278 (5 Cir.1975), and approved in *Curcio I, supra,* 680 F.2d at 889. However, our summary of the transcript shows that on several occasions when Francis started down this path, the judge inserted an interrogation. Something is also sought to be

---

**13.** Francis has even had prior experience with joint representation. He and his father were codefendants, jointly represented by Zeldes, in a 1977 federal tax prosecution. Zeldes worked out a plea agreement under which Francis would plead to one count and the Government would drop all charges against the senior Cur-

cio and recommend no more than six months' incarceration for Francis. Before accepting Francis' plea, Judge Zampano conducted a waiver hearing something like that below and concluded that Francis' choice of joint representation was voluntary and knowing.

made of Francis' failure to identify and explicate all the various kinds of conflict inherent in joint representation generally. However, there is no reason why Francis needed to know all of them; it is enough that he showed a grasp of the basic notion of a conflict of interest and was able to identify a few common examples. Further, the transcript indicates that in the questioning designed to have Francis give a narrative statement the judge and Francis sometimes talked right past one another—the former eager to have Francis articulate the kinds of possible conflict inhering generally in joint representation, the latter, quite understandably, focusing on the unlikelihood of conflicts in his own particular case. It was about his own case that Francis, doubtless impatient with abstraction, baldly said, "I don't see no conflicts." Finally, something is sought to be made of the fact that while Gus consulted with outside counsel, Francis did not. But the cases have spoken of this as an option of which a defendant must be apprised, not as a mandate.

Defense counsel suggests that the court may have been led into error by trial counsel for the Government's having furnished it with a copy of the Third Circuit's opinion in *United States v. Flanagan, supra,* 679 F.2d 1072, which contains language as to the court's powers to insist on separate counsel going well beyond what was said in *Curcio I.* See n. 6, *supra.* This may well be so. Yet even *Flanagan* recognized that "[a] defendant's choice of counsel is not to be dealt with lightly or arbitrarily" and that the choice "should not be interfered with in cases where potential conflicts of interest are highly speculative," 679 F.2d at 1076, as the Curcios and presumably Zeldes thought them to be here. It is true, of course, that while the defendants and defense counsel may have known a good deal about the case that would be made against them and about the common defense they planned to present, they could not know everything relevant to their choice of joint representation. Yet trial counsel for the Government, which has been so zealous in endeavoring to thwart the defendants' desire for joint representation, opposed the efforts of defendants' counsel to obtain information on this score that could add to the Curcios' understanding.[14]

Some weight also should have been given to Zeldes' desire to continue the joint representation. In *Curcio I, supra,* 680 F.2d at 887–88 n. 3, Judge Kearse pointed out that

14. After remand from this court defendants filed a motion on June 14, 1982, requesting disclosure of certain aspects of the Government's case on the ground that it would "permit the Court to comply with the opinion of the Court of Appeals and . . . permit defendants to exercise their rights". The Government formally opposed the motion in its entirety; it was denied by Judge Daly on July 16, 1982.

Near the end of the July 16 hearing the court indicated that when the hearing resumed on July 19 it intended to direct questions not only to Gus and Francis but to Zeldes as well. Zeldes objected that "if there are any questions directed to me, . . . there should be questions directed to the Government lawyers as to the nature of the evidence, as to the specific problems of conflicts . . . which may come up". Assured by the court that it would entertain any written request he might make along these lines, Zeldes filed a formal request on July 19 that the following questions be put to Government counsel:

1. Have you given defendants all information which will aid them in making the determination called for by the Court of Appeals opinion?

2. If not, what other information about the case would aid them, such as

a. In what way do defendants have a different role, according to the Government's allegation or proof?

b. As to the substantive counts, which defendant Curcio is liable only under the *Pinkerton* doctrine, and on which counts according to the Government's allegations or proof?

c. Have you reviewed the problems of joint representation by defendants' counsel to see which problems would be cured by the Government trying the Curcio brothers separately?

At the beginning of the July 19 hearing the judge stated that he considered these questions to be efforts to circumvent his prior ruling against discovery and would not put either of them. The Government, although disclosing that it did not presently contemplate making either of the Curcios a plea bargain offer, did not provide any of the information Zeldes sought.

an attorney has an independent professional duty not to "continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests . . . ." ABA Disciplinary Rule 5–105(B). Zeldes, no tyro in the criminal practice, had thus been alerted to his responsibilities and knew the consequences of a breach; he had conferred repeatedly with his clients and we must assume that he had satisfied himself. See *Cuyler v. Sullivan, supra,* 446 U.S. at 346–47, 100 S.Ct. at 1717.

We thus do not see how the conclusion that Francis' waiver was not knowing and intelligent can stand unless it is saved by the judge's remark with respect to his demeanor and appearance. This, of course, can be important and, if the judge had elaborated a bit upon it, might have been decisive. But see *Faretta, supra,* 422 U.S. at 808–10, 835–36, and n. 7, 95 S.Ct. at 2527–2529, 2541, and n. 7, *supra.* We do not agree with appellants that demeanor is significant only when credibility is at issue. If the judge had indicated that there was something furtive, hangdog, or otherwise suspicious about Francis' method of answering, we might well be bound to sustain him. But we are left simply to guess. The defendants, after two days of hearing, not to speak of the prior hearing in February and the successful appeal to this court, were entitled to something more than this before being deprived of their right to counsel of their choice. We could, of course, remand again for an explanation of the judge's remark, but after two hearings and two appeals defendants have been put through enough and it is time that this case be tried.

In light of our disposition it is unnecessary to pass on defendants' claims that it was error to exclude Francis from the July 22, 1982, hearing while Gus testified or that, if the judge persisted in his ruling, a severance should be granted.

The order denying joint representation is reversed. The mandate shall issue seven days after the entry of judgment and the stay of pretrial and trial proceedings will then be vacated.