Bruce DOUGLAS, Appellant,

v.

UNITED STATES, Appellee.

No. 82–1048.

District of Columbia Court of Appeals.

Argued Sept. 15, 1983.

Decided Feb. 13, 1985.

W. Anthony Fitch, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the brief was filed, were on the brief, for appellant.

Bruce A. Peterson, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, Judith Hetherton, and Robert F. O'Neill, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, FERREN and BELSON, Associate Judges.

FERREN, Associate Judge:

Appellant challenges a trial court order of January 25, 1982, denying his pretrial motion to dismiss the indictment on grounds of double jeopardy. During the first trial before Judge Hannon in September 1981, appellant's retained counsel, Gerald Kane, received a letter from the Office of Bar Counsel informing Kane that appellant had filed a complaint against him and that Bar Counsel, accordingly, was opening an inquiry into Kane's conduct. Appellant had lodged his complaint with Bar Counsel several weeks before trial. It alleged that Kane had not made a sufficient effort to obtain a bond reduction; it was unrelated to Kane's trial preparation or performance. Both appellant and Kane unambiguously expressed a desire for the trial to continue with Kane as counsel. Judge Hannon acknowledged, after a hearing, that Kane's challenged pretrial conduct did not amount to ineffective assistance and did not compromise Kane's ability to represent appellant effectively at trial. The judge concluded, nonetheless, that Bar Counsel's inquiry in itself created an insurmountable conflict of interest between Kane and his client. Judge Hannon, therefore, declared a mistrial *sua sponte*.

 Appellant contends that, because the trial court declared a mistrial without exploring ways to accommodate his expressed desire to continue with the trial, a second trial will violate his rights under the double jeopardy clause of the Fifth Amendment. We agree. That clause bars a second prosecution unless the defendant consents to the mistrial—which did not happen here—or the government is able to demonstrate a "manifest necessity" for stopping the first trial. *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). Although Bar Counsel's inquiry provided ample reason for the trial court to inquire into Kane's ability to provide appellant with effective assistance, it did not constitute an automatic basis for declaring a mistrial. Appellant apparently was willing to waive his constitutional right to effective assistance of counsel, *i.e.*, to a lawyer unhindered by a conflict of interest. The trial court, therefore, was obliged to investigate this possibility—this less drastic alternative—before rejecting appellant's request to go forward with the trial. The court's obligation to explore a waiver was enhanced, moreover, by another constitutionally protected right at issue here: appellant's right to counsel of choice. Without consideration of the possible waiver, therefore, the trial court had no reasonable basis for concluding there was "manifest necessity" for a mistrial. Accordingly, appellant may not be prosecuted a second time; we have no alternative to vacating the challenged order and directing dismissal of the indictment.

I. FACTS AND TRIAL COURT PROCEEDINGS

Appellant was arrested on July 12, 1979, and detained in lieu of posting a $5,000

surety bond in connection with charges arising from two separate crimes, an armed assault and an armed robbery. A grand jury later returned a five count indictment charging appellant with one count of armed assault with intent to kill, D.C.Code §§ 22–501, –3202 (1973); one count of armed assault with intent to rob, *id.* §§ 22–501, –3202; one count of armed robbery, *id.* §§ 22–2901, –3202; one count of carrying a pistol without a license, *id.* § 22–3204; and one count of unauthorized use of a vehicle, *id.* § 22–2204 (Supp. V 1978).[1]

Soon after his arrest, appellant retained Gerald Kane, a member of the District of Columbia Bar. Kane first entered his appearance at a preliminary hearing on July 18, 1979, and one week later filed a bond review motion for appellant's release into third party custody. The trial court denied this motion and placed appellant in a Department of Corrections halfway house. On May 8, 1980, the court granted a second bond review motion filed by Kane and released appellant pending trial into the third party custody of his parents.

In September 1980, appellant failed to appear for a scheduled court date; the trial court issued a bench warrant for his arrest. Appellant was apprehended on March 16, 1982, and charged with violating provisions of the Bail Reform Act (BRA), D.C.Code § 23–1327 (1981). Although the court initially joined the BRA charge with appellant's earlier charges, the BRA charge was later severed and is not at issue in this appeal. Appellant's case was assigned to Judge Hannon, who imposed a $25,000 surety bond and scheduled trial for September 1981. Kane appeared on appellant's behalf at a number of proceedings related to the BRA charge and to the setting of bond, and continued to represent appellant on the charges contained in the original indictment.

Because appellant was unable to post bond, he remained incarcerated awaiting trial. During the spring and early summer of 1981, appellant sent a number of letters to Judge Hannon's chambers. In them, he offered an explanation for his failure to appear for his scheduled court date and requested a reduction of bond. While the first two letters did not mention appellant's attorney, each of three later letters contained some reference to appellant's belief that Kane was not exerting sufficient effort to obtain a bond reduction. At no point, however, did appellant indicate that he wanted Kane removed as his attorney or that he wanted the court to appoint new counsel. Kane did, in fact, file a motion to reduce bond on July 10, 1981. That motion was denied.

At a status hearing on July 13, 1981, Judge Scott, substituting for Judge Hannon, informed Kane of appellant's complaints about his failure to obtain a reduction of appellant's bond. Judge Scott then questioned appellant and ascertained that appellant wished to continue to trial with Kane as his attorney. Judge Scott concluded that there was no basis for finding ineffective assistance of counsel, and he permitted Kane to remain as appellant's attorney. Judge Scott, nonetheless, did indicate that he would refer appellant's complaints about Kane to the Office of Bar Counsel.

After the July 13 status hearing, and at Judge Scott's request, the Office of Bar Counsel contacted appellant, asking if he wished to file a complaint against Kane. Appellant filed a complaint, alleging principally that Kane had failed to make diligent efforts for pretrial release. Neither Kane nor the trial court was informed about this complaint before trial began.

---

**1.** D.C.Code §§ 22–501, –2901 and –3204 were incorporated into the 1981 D.C.Code without change. The statutory provision providing additional penalties for committing a crime while armed has been amended, but remains at D.C. Code § 22–3202 (Supp.1984). Section 22–2204, prohibiting unauthorized use of a vehicle, has been amended and is now codified at D.C.Code § 22–3815 (Supp.1984). Because the events at issue in this case occurred before these statutory amendments, the amendments are not relevant here.

The court reached appellant's case for trial on September 9, 1981. Before proceeding with jury selection, Judge Hannon raised the issue of appellant's dissatisfaction with Kane, as reflected in the letters to the court several months earlier. Although Judge Scott previously had questioned appellant about these letters, Judge Hannon decided to conduct a hearing, pursuant to this court's holdings in *Monroe v. United States*, 389 A.2d 811 (D.C.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), and *Farrell v. United States*, 391 A.2d 755 (D.C.1978), to determine whether Kane's "pretrial representation was 'within the range of competence demanded of attorneys in criminal cases.'" *Farrell*, 391 A.2d at 762 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)). In response to a series of questions from the court, appellant indicated that he and Kane had discussed the case fully and that he wished to proceed to trial with Kane as his attorney. Judge Hannon, finding that Kane was prepared to render effective representation at trial, ordered that the trial go forward.

After a jury had been selected and sworn, both the government and defense presented opening statements. Kane's opening statement set forth the defense theory, arguing that one of the government's principal witnesses—appellant's former girl friend—had committed the crimes charged and was now attempting to frame appellant in order to exculpate herself. The government called as its first witness one of the two complainants, who testified that he had been the victim of an armed robbery. This witness did not make an in-court identification of appellant, and his testimony concerning two attempted out-of-court identification procedures reflected serious uncertainty as to the witness' ability to recognize his assailant. On cross-examination, Kane used several impeachment techniques to discredit the witness' testimony. Following this testimony, the court adjourned for the day.

On the morning of the second day of trial, Kane informed the court that he had just received a letter from the Office of Bar Counsel notifying him of appellant's complaint. The letter stated that Bar Counsel was opening an inquiry into Kane's conduct, that Kane had a right to counsel of his choice, and that Kane should submit within ten days a written response to appellant's grievances.

Appellant confirmed that he had filed a complaint with Bar Counsel several weeks before trial. He indicated, however, that he had understood Bar Counsel would not notify Kane of the complaint until after an investigation had been conducted, and that the existence of the complaint would not interfere with his trial. Appellant informed the court: "I would like to keep Mr. Kane—and continue this trial." Kane's position before the court was also unequivocal: "It's my candid desire that, if humanly possible, for the trial to go forward."

Judge Hannon responded to this development by noting that commencement of the Bar Counsel inquiry presented issues "substantially different" from those considered at the *Monroe/Farrell* hearing the previous day. Although he reaffirmed his earlier ruling that Kane's pretrial conduct did not constitute ineffective assistance and did not compromise Kane's ability to continue with the trial,[2] Judge Hannon concluded that the Bar Counsel inquiry amounted to an "adversary proceeding" between appellant and Kane and thus created a conflict of interest for Kane. At the outset, the court noted that this conflict of interest could not be resolved simply because appellant retained confidence in Kane's ability to represent him at trial. The court stated "it

---

2. Judge Hannon stated he was "satisfied that the matter that was resolved yesterday did, indeed, put whatever conflict existed between Mr. Douglas and his lawyer, Mr. Kane, at rest and that the rights of Mr. Douglas would be fully protected in the trial of this case with Mr. Kane as his attorney," if it were not for the Bar Counsel matter.

is entirely clear to this [c]ourt that... so long as that adversary proceeding exists in the Office of the Bar Counsel, that this case cannot go forward with Mr. Kane representing [the defendant]."

■ Judge Hannon next recognized that this court's holdings in *Monroe* and *Farrell* ordinarily require a "full hearing" when a potential issue of ineffectiveness of counsel is brought to the court's attention. Upon further consideration, however, he decided that a hearing would be purposeless in this case; he felt he had no alternative to declaring a mistrial:

> [N]o matter what kind of an inquiry this [c]ourt can make at this time.... so long as the adversary proceeding is pending before the Office of Bar Counsel, there is a conflict of interest between the rights of the defendant... and the rights of Gerald Kane as an attorney.
>
> \* \* \* \* \* \*
>
> [Defendant] may very well want to keep [Kane]. But, so long as those proceedings are before the Bar Counsel, [defendant] may not keep him.
>
> \* \* \* \* \* \*

I am not going to let an adversary proceeding between your client and the United States go forward here with you representing him while there's an adversary proceeding pending between you and the Office of Bar Counsel. That is a clear conflict of interest that's against all the canons of ethics that you and I have ever read; and I have no alternative, sir. I have no options in the matter; and that's all there is to that.

Without conducting any inquiry into whether appellant wished to waive his right to conflict-free counsel, and without making any finding of fact on this matter, Judge Hannon *sua sponte* declared a mistrial.[3]

We are thus confronted with the question whether appellant can be brought to trial again.

## II. FIFTH AMENDMENT PROTECTION AGAINST DOUBLE JEOPARDY AND THE REQUIREMENT OF "MANIFEST NECESSITY"

The principle that a defendant may not be tried twice for the same offense has been described as "one of the oldest ideas found in western civilization." *Bartkus v. Illinois*, 359 U.S. 121, 151, 79 S.Ct. 676, 695–96, 3 L.Ed.2d 684 (1959) (Black, J., dissenting). "Its origins can be traced to Greek and Roman times, and it became established in the common law of England long before this Nation's independence." *Benton v. Maryland*, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969) (footnote omitted). The American formulation of this principle—embodied in the double jeopardy clause of the Fifth Amend-

---

**3.** Contrary to its position at the hearing on appellant's double jeopardy motion, the government now concedes that Judge Hannon declared the mistrial *sua sponte,* not at appellant's request. Although Kane eventually acquiesced in the court's decision to terminate the trial, he did not do so until after Judge Hannon had repeatedly called upon him to ask for a mistrial and had stated that a mistrial would be declared with or without his consent. Moreover, both appellant and Kane had already informed the court that they wanted to continue with the trial if at all possible. *Contrast Sedgwick v. Superior Court for District of Columbia,* 190 U.S.App.D.C. 63, 65, 584 F.2d 1044, 1046–47 (1978) (mistrial will not be treated as having been declared over defense objections where "defendant did not express an interest in obtaining a verdict from

the first jury"), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 849, 59 L.Ed.2d 42 (1979).

Unlike many cases in which the defendant is presented with a choice between requesting a mistrial or continuing with a trial tainted by error, *e.g., United States v. Dinitz,* 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976), appellant here was left with no choice but a mistrial. Under these circumstances, appellant cannot be understood to have consented to a mistrial, and the rule that "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution," *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion), is inapplicable. *Cf. Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081 (double jeopardy clause protects against

ment[4]—has long been understood not merely to ensure the finality of criminal judgments and to protect against multiple punishments for the same offense, but also to safeguard a defendant's obvious interest in avoiding the burdens of a second prosecution when his first trial was aborted—unnecessarily—before judgment. *Perez,* 22 U.S. at 580; *see Crist v. Bretz,* 437 U.S. 28, 36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978).

For Fifth Amendment purposes, jeopardy attaches as soon as the jury is empaneled and sworn, or, in a nonjury trial, as soon as the judge begins to hear evidence. *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 569, 97 S.Ct. 1349, 1353, 51 L.Ed.2d 642 (1977). Once jeopardy attaches, the defendant gains a " 'valued right to have his trial completed by a particular tribunal.' " *Braxton v. United States,* 395 A.2d 759, 769 (D.C. 1978) (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)). Consequently, unless a defendant consents to a mistrial, any attempt to begin a second prosecution is vulnerable to dismissal under the double jeopardy clause.

A. *Policies Underlying Double Jeopardy Clause Protection Against a Second Prosecution*

There are several reasons why this "valued right" merits constitutional protection. First, a defendant has an interest in "being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v. Jorn,* 400 U.S. 470, 486, 91 S.Ct. 547, 558, 27 L.Ed.2d 543 (1971) (plurality opinion); *see Crist,* 437 U.S. at 35–36, 98 S.Ct. at 2160–61. This interest in retaining a potentially favorable jury initially arises

with the selection and swearing in of a panel of jurors. For any number of reasons, a defendant may perceive the jury to be sympathetic to his case at the outset. Indeed, the extensive time and effort frequently spent screening veniremen attest to the importance attached to empaneling a receptive jury. *See* 2 A. AMSTERDAM, B. SEGAL & M. MILLER, TRIAL MANUAL FOR DEFENSE OF CRIMINAL CASES § 340 (1971). This interest in retaining a chosen jury may intensify as the trial proceeds, if the defendant senses the trial is going well and the factfinder is leaning toward acquittal. In the present case, for example, appellant apparently had every reason to believe the trial was progressing favorably; counsel had announced a frameup theory to the jury and had substantially undermined the first government witness' ability to identify appellant as his assailant.

Second, when a defendant is forced to abandon a trial in progress and undergo a retrial, the prospects for an acquittal may be lessened and "the risk that an innocent defendant may be convicted" may be enhanced. *Arizona v. Washington,* 434 U.S. 497, 504, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978). The opportunity to present the government's case a second time may permit the prosecutor to compensate for weaknesses exposed during the first trial, correct mistakes, and generally strengthen the government's presentation. This "second crack" at a jury is especially significant when there is an assailant-identification issue, as in this case. Courts have observed that government witnesses frequently become more definite in their testimony and more favorable to the prosecution with successive trips to the stand. *See Carsey v. United States,* 129 U.S.App.D.C. 205, 208–09, 392 F.2d 810, 813–14 (1967). The prosecutor also may benefit from having observed defense strategies at the first trial.[5]

---

judicial or prosecutorial actions "intended to provoke" a defendant's consent to a mistrial).

**4.** "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V.

**5.** It is not inconceivable that a prosecutor would deliberately provoke a mistrial in order to gain the benefits and subject the defendant to the disadvantages discussed in the preceding paragraphs. Thus, a prosecutor might intentionally seek a mistrial for the purpose of removing the

■ Finally, the defendant's right to receive a judgment at the first trial is supported by the realization that inherently—without regard to the merits of the prosecution—"a second [trial] may be grossly unfair. It increases the financial and emotional burden on the accused, [and] prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing." *Arizona,* 434 U.S. at 503–04, 98 S.Ct. at 829.[6] Because these burdens of delay, expense, and personal anxiety will inevitably be associated with a reprosecution, regardless of whether the defendant is ultimately found guilty or innocent, a defendant need not demonstrate any other prejudice when seeking to bar a retrial on double jeopardy grounds. *Illinois v. Somerville,* 410 U.S. 458, 471, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425 (1973).

### B. Policies Justifying Declaration of a Mistrial, and Retrial, over Defense Objection

■ Despite these significant considerations weighing against declaration of a mistrial over defense objection, a defendant does not have an absolute right to dismissal of an indictment simply because a judge aborts the first trial without defense consent. It is "readily apparent that a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from government harassment which such a mechanical rule would provide." *Jorn,* 400 U.S. at 480, 91 S.Ct. at 554. Rather, " 'a

defendant's valued right to have his trial completed by a particular tribunal must in some circumstances be subordinated to the public's interest in fair trials designed to end in just judgments.' " *Id.* (quoting *Wade,* 336 U.S. at 689, 69 S.Ct. at 837). For this reason, when courtroom errors or other developments at trial make a just judgment impossible, the public's interest in maintaining the integrity of the criminal justice system will outweigh the defendant's right to obtain a judgment, and the court may terminate the trial without the defendant's consent and without foreclosing reprosecution.

Justice Story first articulated in *Perez* the standard a trial court must apply in determining whether circumstances warrant a mistrial over defense objection:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is *manifest necessity* for the act, or the ends of public justice would otherwise be defeated.

22 U.S. (9 Wheat.) at 580 (emphasis added). Although Justice Story instructed that a trial court may "exercise a sound discretion" in applying this standard, he nonetheless advised that the power to terminate a trial without the defendant's consent "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.*

case from an acquittal-prone jury, of harassing a defendant with repeated prosecutions, or of gaining tactical advantages that increase the likelihood of conviction. While a showing of such deliberate misconduct would strengthen a defendant's claim that double jeopardy bars a second trial, *Oregon v. Kennedy,* 456 U.S. 667, 675, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982), we note that the detriments incurred by a defendant as the result of a mistrial may be the same even in the absence of government misconduct. For this reason, a defendant's "significant interest in the decision whether or not to take the case from the jury" exists "independent

of the threat of bad-faith conduct by judge or prosecutor." *Jorn,* 400 U.S. at 485, 91 S.Ct. at 557.

**6.** *See Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957) ("the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity").

Accordingly, the "manifest necessity" standard in *Perez* is "a command to trial judges not to foreclose the defendant's option [to continue with a trial] until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Jorn*, 400 U.S. at 485, 91 S.Ct. at 557. To satisfy this command, a trial court must engage in a two-step inquiry.

First, the court must determine whether a trial development gives rise to a " 'high degree' of necessity" to terminate the trial. *Braxton*, 395 A.2d at 769 (quoting *Arizona*, 434 U.S. at 506, 98 S.Ct. at 831). Although this standard "does not require demonstration of absolute necessity," *Braxton*, 395 A.2d at 769, the reasons for aborting a trial must be sufficient to override the defendant's double jeopardy interests. *Id.* A mistrial without defense consent is therefore justified " 'only in very extraordinary and striking circumstances,' " *Downum v. United States*, 372 U.S.

734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963) (quoting *United States v. Coolidge*, 25 Fed.Cas. 622, 623 (C.C.D.Mass. 1815) (No. 14858) (Story, J.)), where it becomes impossible for the jury to reach an impartial verdict, or there is improper conduct of such a nature that a conviction would likely be reversed on appeal. *Somerville*, 410 U.S. at 464, 93 S.Ct. at 1070; *United States v. Bristol*, 325 A.2d 183, 186 (D.C.1974).[7]

Second, even when there is a high degree of necessity that would ordinarily justify a mistrial, the trial judge must determine whether an alternative measure—less drastic than a mistrial—can alleviate the problem so that the trial can continue to an impartial verdict. *See Jorn*, 400 U.S. at 487, 91 S.Ct. at 558; *Coleman v. United States*, 449 A.2d 327, 329 (D.C.1982). While the trial judge need not adopt an alternative that runs directly counter to a "legitimate state policy," *Somerville*, 410 U.S. at 469,[8] 93 S.Ct. at 1073, the judge

---

**7.** Decisions which approve findings of manifest necessity turn on the particular facts of the case and thus escape meaningful categorization. *Somerville*, 410 U.S. at 464, 93 S.Ct. at 1070. Nevertheless, a consideration of these decisions is useful to illustrate the types of matters that traditionally create a "high degree" of necessity for a mistrial. *Arizona* (prejudicial comment during defense counsel's opening statement to jury); *Somerville* (indictment discovered to be insufficient to charge a crime and not amendable under state law); *Brock v. North Carolina*, 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1953) (two important government witnesses invoked Fifth Amendment rights and refused to testify); *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949) (military court-martial in field discharged when Army's advance made attendance of witnesses impractical); *Thompson v. United States*, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894) (juror found to have served on grand jury which indicted defendant); *Simmons v. United States*, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed.2d 968 (1891) (letter published in newspaper rendered juror's impartiality doubtful); *Perez* (jury unable to reach a unanimous verdict); *Wright v. United States*, 365 A.2d 365 (D.C.1976) (defense counsel's improper remarks before jury and lack of preparation for trial); *United States v. Sedgwick*, 345 A.2d 465 (D.C.1975) (mistrial based on court's reasonable belief that defense was denied access to information to

which it was entitled), *cert. denied*, 425 U.S. 966, 96 S.Ct. 1751, 48 L.Ed.2d 210 (1976).

**8.** In *Somerville*, the court declared a mistrial upon discovering that the indictment was defective and that state law made it impossible to cure the defect by amendment. The Supreme Court held that, because the state law limiting the use of amendments to cure defective indictments served the "legitimate state policy" of protecting the grand jury process, the state court was not constitutionally required to alter state law and permit an amendment in order to avoid a mistrial and protect double jeopardy interests. 410 U.S. at 468–71, 93 S.Ct. at 1072–74. Courts have not, however, permitted trial judges to reject less drastic alternatives when the state policy at issue is less compelling or can be protected without resorting to a mistrial. *E.g.*, *Coleman*, 449 A.2d at 329 (mistrial—granted when *Bruton* problem arose regarding use of a codefendant's confession—is not justified under manifest necessity standard, because trial court failed to consider less drastic step of severing defendant's case and continuing with trial; double jeopardy interests outweigh general rule that defendants charged with jointly committing a crime are to be tried jointly); *Bristol*, 325 A.2d at 187 n. 4 (no retrial permitted following mistrial declared *sua sponte* in reaction to defense counsel's admittedly unprofessional behavior, in part because "[o]ther means of censure and discipline [of attorneys] are available which do

should not resort to a mistrial when some other course of action can mitigate or cure the trial prejudice and thereby accommodate both the defendant's interest in retaining a particular jury and society's interest in just and defensible judgments.

### C. *Scope of Review of Sua Sponte Declaration of a Mistrial*

We next turn to the standards which a reviewing court must apply when confronted by a claim of double jeopardy.[9] In attempting to bring a second prosecution after a mistrial granted over defense objection, the government bears a heavy burden to justify the mistrial decision. *Arizona*, 434 U.S. at 505, 98 S.Ct. at 830. "The words 'manifest necessity' appropriately characterize the magnitude of [this] burden." *Id.* Thus, in determining whether a retrial is barred, a reviewing court must "resolve any doubt 'in favor of the liberty of the citizen.'" *Downum*, 372 U.S. at 738, 83 S.Ct. at 1035 (quoting *United States v. Watson*, 28 Fed.Cas. 499 (S.D. N.Y.1868) (No. 16651)). Reviewing courts are obligated to "scrutiniz[e]" mistrial decisions, *Somerville*, 410 U.S. at 462–63, 93 S.Ct. at 1069–70, and "satisfy themselves that... the trial judge exercised 'sound discretion' in declaring a mistrial." *Arizona*, 434 U.S. at 514, 98 S.Ct. at 835 (quoting *Perez*, 22 U.S. at 580).

This is not to say a reviewing court is to engage in *de novo* consideration of the "manifest necessity" issue. A reviewing court ordinarily will accept a trial judge's determination that there is a "high degree of necessity" for a mistrial, without

a less drastic alternative, as long as that determination is reasonable. *See Somerville*, 410 U.S. at 459, 93 S.Ct. at 1068; *United States v. Sedgwick*, 345 A.2d 465, 472 (D.C.1975), *cert. denied*, 425 U.S. 966, 96 S.Ct. 1751, 48 L.Ed.2d 210 (1976); *Coleman*, 449 A.2d at 329. This is true even when the reviewing court is aware that, if presented with the question in the first instance, other trial judges—or the reviewing court itself—might well be persuaded to continue with the trial. *See Arizona*, 434 U.S. at 509–10, 98 S.Ct. at 832–33; *Sedgwick*, 345 A.2d at 472.

In evaluating the reasonableness of a mistrial decision, the level of deference accorded the trial court's determination will depend on "the particular problem confronting the trial judge." *Arizona*, 434 U.S. at 506, 98 S.Ct. at 830 (footnote omitted). The Supreme Court has recognized that there is a "spectrum of trial problems which may warrant a mistrial," and that these problems "vary in their amenability to appellate scrutiny." *Id.* at 510, 98 S.Ct. at 833. For instance, when a mistrial is declared because the jury is deadlocked in deliberations and unable to reach a verdict, or because of a courtroom error that the trial judge believes may result in irreparable jury bias, a reviewing court generally should accord "the highest degree of respect" to the trial judge's determination of "manifest necessity." *Id.* at 511, 98 S.Ct. at 833; *see id.* at 509–11, 98 S.Ct. at 832–33.[10] The reason for this heightened deference is that "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination" regarding the

---

not affect the [double jeopardy] rights of a defendant"); *Bretz v. Crist*, 546 F.2d 1336, 1347 (9th Cir.1976), *aff'd*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (mistrial granted as to both counts of indictment when it was discovered that a typographical error in Count II rendered that count defective; no "manifest necessity" existed to support mistrial on Count I because trial could have proceeded on Count I alone, with the only policy weighing against this alternative being "the state's convenience in litigating the case as a unit").

9. The "reviewing court" standards set forth here should guide both trial and appellate courts asked to evaluate an earlier mistrial decision, in order to determine whether a second prosecution is barred on double jeopardy grounds.

10. Of course, even in this type of case, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for ... deference by an appellate court disappears." *Arizona*, 434 U.S. at 510 n. 28, 98 S.Ct. at 832–33 n. 28.

jury's ability to render an impartial verdict. *Id.* at 510 n. 28, 98 S.Ct. at 832–33 n. 28. When, however, a mistrial decision is based on factors that are not uniquely within the purview of the trial court, the reviewing court need not defer to the trial judge's reasoning and conclusions.[11]

▮▮▮▮▮ In order to satisfy itself that sound discretion was exercised in declaring a mistrial, a reviewing court should not focus exclusively on the trial judge's reasons or on a lack of expressed reasons. The double jeopardy clause does not mandate that a trial judge make findings of fact or set forth specific reasoning. *Arizona,* 434 U.S. at 516–17, 98 S.Ct. at 835–36. Thus, the absence of specific findings or reasoning in the record regarding "manifest necessity," or the lack of less drastic alternatives, does not necessarily mean that the trial judge failed to exercise "sound discretion." *Id.*[12] Alternatively, when a trial judge's reasons for declaring a mistrial are placed on the record, a reviewing court is not prohibited from looking behind these reasons to see if they accurately reflect the record and support a de-

termination of manifest necessity. *Braxton,* 395 A.2d at 769.[13] Accordingly, the reviewing court should look at the record as a whole in determining whether the mistrial was justified by "manifest necessity." *Id.*

▮▮▮▮▮ In sum, the reviewing court should require that " 'the basis for the trial judge's mistrial order [be] adequately disclosed by the record.' " *Id.* (quoting *Arizona,* 434 U.S. at 517, 98 S.Ct. at 836). While the trial judge need not set forth reasoning, unless the reviewing court is able to discern from the record "[p]recise and justified reasons" for the mistrial, a second prosecution should not be permitted. *Bristol,* 325 A.2d at 187. This means that the record must support both (1) a reasonable conclusion that the events at trial were sufficiently serious to override the interests of the defendant in completing the trial, and (2) a determination that there were no "measures short of mistrial" that "might have sufficed to mitigate or cure any perceived undue trial prejudice." *Braxton,* 395 A.2d at 773; *See Brady v. Samaha,* 667 F.2d 224, 229–31 (1st Cir.

---

**11.** *Compare Braxton,* 395 A.2d at 769–73 (where reviewing court was able to determine from the record that conduct of defense attorneys was not "in any sense out of the ordinary," *id.* at 772, it rejected trial court determination that defense counsel's behavior threatened to undermine effective assistance of counsel) *with Gori v. United States,* 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961) (where mistrial was granted based on trial judge's assessment that prosecutor's line of questioning might unfairly result in jury bias, reviewing court refused to "scrutinize with sharp surveillance the exercise of [the trial judge's] discretion").

Reviewing courts also should give special scrutiny to mistrial decisions when there is some reason to believe the prosecutor provoked a mistrial in an effort to harass or to achieve tactical advantage over the accused. *Arizona,* 434 U.S. at 508, 98 S.Ct. at 831.

**12.** Although a trial judge's failure to place reasons on the record is not determinative, reviewing courts frequently have found that the judge's failure to discuss less drastic alternatives has a significant bearing on whether "sound discretion" was exercised. *See Braxton,* 395 A.2d at 773; *Brady v. Samaha,* 667 F.2d 224, 229 (1st Cir.1981); *Harris v. Young,* 607 F.2d 1081, 1085

(4th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *United States v. Sanders,* 591 F.2d 1293, 1298 (9th Cir.1979); *United States v. McKoy,* 591 F.2d 218, 223 (3d Cir.1979); *Dunkerley v. Hogan,* 579 F.2d 141 (2d Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *United States v. Starling,* 571 F.2d 934, 941 (5th Cir.1978).

**13.** *See Braxton,* 395 A.2d at 773 n. 17:

The issue upon review ... is not whether a sound discretion was in fact exercised but whether *from the record* we can say that a sound discretion was exercised. Where the undisputed facts upon which [a] decision was made compel a conclusion that there was manifest necessity for a mistrial, the trial judge will be presumed to have exercised his sound discretion in reaching the only legally correct decision. [Citation omitted.] Conversely where the record compels a conclusion that a declaration of mistrial was inappropriate, the means by which the decision was reached is irrelevant. [Citation omitted.] Between these extremes, however, we must rely upon indications of record that the decision resulted from an exercise of judicial discretion. [Emphasis in original.]

1981); *Dunkerley v. Hogan,* 579 F.2d 141, 146–48 (2d Cir.1978); *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979).

III. INTERACTION OF (A) THE FIFTH AMENDMENT PROTECTION AGAINST DOUBLE JEOPARDY, (B) THE SIXTH AMENDMENT GUARANTEE OF EFFECTIVE ASSISTANCE OF COUNSEL, AND (C) THE FIFTH AND SIXTH AMENDMENT RIGHT TO RETAIN COUNSEL OF CHOICE

Emphasizing appellant's Sixth Amendment right to effective assistance of counsel, the government argues there was "manifest necessity" for a mistrial because Bar Counsel's investigation of appellant's complaint against Kane necessarily undermined the adequacy of appellant's legal representation. Had the trial gone forward, says the government, a resulting conviction would have been vulnerable on appeal.

Appellant responds in three ways: first, he denies that Bar Counsel's inquiry into the pretrial bond reduction dispute compromised Kane's ability to provide effective representation at trial. Second, he stresses that, even if Kane were not conflict-free, Judge Hannon completely ignored—or arbitrarily rejected, without serious consideration—the less drastic alternative of permitting a knowing, intelligent, and voluntary waiver of appellant's right to effective assistance of counsel. Finally, appellant asserts that Judge Hannon's decision to disqualify Kane over objection necessarily infringed on his Fifth and Sixth Amendment right to retain counsel of choice. While acknowledging that the right to counsel of choice is not absolute, appellant stresses that this right is significant enough to prevent the trial court from rejecting a criminal defendant's waiver of conflict-free counsel solely because the court itself perceives that a waiver would not be in the defendant's best interest.

We conclude that: (1) The record supports a finding that Kane's conflict of interest could have compromised his ability to render effective assistance to appellant during the remainder of the trial. Therefore, unless a reasonable, less drastic alternative was available, the trial court was justified in declaring a mistrial. (2) Given appellant's and Kane's expressed desire to go forward with trial, the court should have considered a feasible alternative to a mistrial: a knowing, intelligent, and voluntary waiver of the right to conflict-free counsel. (3) The record provides no basis for concluding that a waiver of conflict-free counsel would have been unavailing, especially in light of appellant's constitutional right to counsel of choice.

A. *Attorney Conflicts of Interest and Manifest Necessity*

At the outset, we note that during the discussion before his declaration of a mistrial, Judge Hannon never expressly made a finding of "manifest necessity." In fact, at no time did he evince a concern for the possible double jeopardy consequences of his decision; he never referred to appellant's constitutionally protected interest in having the trial concluded before the jury already empaneled. We must, nonetheless, review the record as a whole to determine whether Bar Counsel's investigation created the required high degree of necessity to support a mistrial.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right... to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. In giving content to this safeguard, the Supreme Court has repeatedly emphasized that "the right to counsel is the right to the effective assistance of counsel." *E.g., McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970) (citations omitted). The "first essential element of effective assistance of counsel" is counsel's ability and willingness "to advocate fearlessly and effectively" on behalf of his client. *United States v. Hurt,* 177 U.S.App.D.C. 15, 20–21, 543 F.2d 162, 167–68 (1976); *see· Anders v. California,* 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18

L.Ed.2d 493 (1967); *Tate v. United States,* 123 U.S.App.D.C. 261, 269, 359 F.2d 245, 253 (1966). For this reason, the importance of ensuring that defense counsel is not subject to any conflict of interest which might dilute loyalty to the accused has been long and consistently recognized: "[t]he right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client." *Von Moltke v. Gillies,* 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948); *accord Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (defense counsel "owes the client a duty of loyalty, a duty to avoid conflicts of interest") (citation omitted); *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981) (the Sixth Amendment gives rise to a "correlative right to representation that is free from conflicts of interest").[14]

■ To protect this right to conflict-free counsel, the trial court has an affirmative "duty to inquire" into the effectiveness of counsel whenever "the *possibility* of a conflict" becomes apparent before or during trial. *Wood,* 450 U.S. at 272, 101 S.Ct. at 1103–04 (emphasis in original).[15] If such

an inquiry reveals that an actual conflict of interest exists, and the defendant objects to continued representation by the conflict-burdened attorney, new counsel must be appointed. Indeed, a failure to appoint new counsel under these circumstances will lead to a reversal of any conviction obtained at trial. *See Holloway v. Arkansas,* 435 U.S. 475, 487–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426 (1978). Even in cases where a defendant does not object at trial to an attorney's representation, a Sixth Amendment violation warranting reversal will be established if a convicted defendant demonstrates on appeal that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718 (footnote omitted).[16]

In applying these standards here, we note that as soon as Kane learned of Bar Counsel's intention to pursue an investigation of appellant's complaint, he acquired a personal interest in the way he conducted appellant's defense—an interest independent of, and in some respects in conflict with, appellant's interest in obtaining a judgment of acquittal. For instance, fearing that appellant's complaint to Bar Coun-

**14.** In addition to expressing a general concern that divided loyalties might compromise the zealousness of representation, courts have expressly recognized that a conflict of interest may jeopardize an accused's right to effective counsel when, as in the present case, the defense attorney acquires an independent personal or pecuniary interest in the verdict or in the manner in which the defense case is conducted. *E.g., People v. Corona,* 80 Cal.App.3d 684, 145 Cal.Rptr. 894 (1978) (defense counsel negotiates royalty agreement for property rights to defendant's life story); *see, e.g., Hurt* (appellate counsel should be permitted to withdraw when defendant's former trial counsel brings law suit charging that appellate counsel's brief on appeal is libelous).

**15.** *See Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980) (inquiry should be initiated whenever court "knows or reasonably should know that a particular conflict exists"); *cf. Monroe v. United States,* 389 A.2d 811 (D.C.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Farrell v. United States,* 391 A.2d 755 (D.C.1978); *Pierce v.*

*United States,* 402 A.2d 1237 (D.C.1979) (establishing trial court's duty to conduct inquiry and make findings on the record when possibility of ineffective assistance of counsel is brought to trial court's attention before trial).

**16.** Although a defendant who fails to object at trial must demonstrate that "a conflict of interest actually affected the adequacy of his representation" in order to succeed with an ineffective assistance claim on appeal, he or she need not go so far as to show that the conflict prejudiced the outcome of the case. *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1718–19 (constitutionally defective conflict of interest is never harmless error); *see Strickland,* 104 S.Ct. at 2067 (defense counsel's conflict of interest gives rise to a limited presumption of prejudice). Moreover, certain "personal conflict[s] of interest" may so undermine an attorney's ability to render adequate representation that they require reversal without regard to whether the defendant objected at trial or is able to show on appeal that adverse effect resulted from the conflict. *See United States v. Cancilla,* 725 F.2d 867, 868–71 (2d Cir.1984).

sel might later be expanded to include claims of ineffective assistance at trial, Kane would have an inordinate interest in conducting the defense in a manner calculated to minimize any opportunity for *post hoc* criticism of his efforts. This could compromise Kane's professional judgment about the best means of defending this particular case; it could encourage the most standard or conservative trial strategy, as well as overcautious tactical decisions and courtroom demeanor. Furthermore, concerns about the pending investigation might impede communications between appellant and Kane. Kane might be apprehensive about sharing with appellant the reasons behind tactical defense decisions and refrain from disclosing to appellant any unexpected problem that arose during the course of trial.[17] Appellant, in turn, might be reluctant to question Kane's trial decisions for fear of further alienating counsel in the midst of trial.

Thus, the circumstances at the time of the mistrial were not conducive to the cooperative spirit and singlemindedness of purpose that ordinarily should underlie a defendant/attorney relationship. Additionally, because Judge Hannon had a firsthand opportunity to observe the relationship between appellant and Kane over the course of several months, we give substantial deference to his finding that the conflict of interest would have adversely affected Kane's ability to render effective assistance to appellant at trial.

In short, had Judge Hannon simply ignored Bar Counsel's investigation and allowed the trial to continue with Kane representing appellant, it is reasonable to conclude that any conviction obtained as a result would have been vulnerable if appealed on Sixth Amendment grounds. *See Scott v. District of Columbia,* 99 A.2d 641 (D.C.1953), *aff'd* 94 U.S.App.D.C. 227, 214 F.2d 860 (1954); *Hurt,* 177 U.S.App.D.C.

at 20–21, 543 F.2d at 167–68. Accordingly, if appellant had refused to waive his right to conflict-free counsel, and no other means of curing the negative effects of this conflict were available, a trial court finding of manifest necessity for a mistrial would have been appropriate.

B. *Waiver of Conflict-Free Counsel as a Less Drastic Alternative to a Mistrial*

Next, we must determine whether, at the time the court declared a mistrial, there were "measures short of mistrial" that "might have sufficed to mitigate or cure" the problems arising from Kane's conflict of interest. *Braxton,* 395 A.2d at 773; *see Coleman,* 449 A.2d at 329. In particular, appellant argues that he should have received an opportunity to waive his right to independent counsel and thereby to preserve his double jeopardy interests by continuing the trial with Kane as counsel.

The Supreme Court has recognized that "a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests." *Holloway,* 435 U.S. at 483 n. 5, 98 S.Ct. at 1178 n. 5 (citing *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942)); *see Wood,* 450 U.S. at 273–74, 101 S.Ct. at 1104–05. Case law in this jurisdiction, as well as in federal and other state jurisdictions, is to the same effect. *See, e.g., Lollar v. United States,* 126 U.S.App.D.C. 200, 201–03, 376 F.2d 243, 244–46 (1967); Annot., 53 A.L.R. Fed. 140, at § 23 (1981); Annot., 18 A.L.R. 4th 360, at §§ 25–27 (1982). Furthermore, the ethical rules of the legal profession, upon which Judge Hannon relied in deciding to terminate the trial, expressly allow an attorney to accept or continue employment even though his or her own interests may impair independent professional judgment, as long as it is

---

17. The American Bar Association Standards for Criminal Justice require that a defense attorney make all tactical and stragegic decisions "after consultation with the client." Standard 4–5.2(b) (2d ed. 1979). If there is disagreement between

the lawyer and client on such matters, the lawyer is instructed to keep a record of "the lawyer's advice and reasons, and the conclusions reached." *Id.* at 4–5.2(c).

"with the consent of his [or her] client after full disclosure." MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 5–101(A) (1981); D.C.App.R. X (1978).[18]

As with the relinquishment of other important constitutional rights, waivers of conflict-free counsel must be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970) (footnote omitted); *see Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Hsu v. United States*, 392 A.2d 972, 981–87 (D.C.1978). The court "must indulge every reasonable presumption against the waiver of the unimpaired assistance of counsel," *Campbell v. United States*, 122 U.S.App.D.C. 143, 144–45, 352 F.2d 359, 360–61 (1965), and ensure that the defendant is "aware of the dangers and disadvantages... so that the record will establish that 'he knows what he is doing and his choice is made with his eyes open.'" *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). Thus, before a waiver is accepted the trial court should conduct, on the record, an inquiry sufficient to establish that the defendant is aware of the right to conflict-free representation; understands the nature of the risks and the potential adverse effects of foregoing that right; and knows that, if convicted, he or she will not be able to complain on appeal that the defense at trial was compromised by the conflict. *See Lollar*, 126 U.S.App.D.C. at 202–03, 376 F.2d at 245–46; *United States v. Curcio (Curcio I)*, 680 F.2d 881, 888–90 (2d Cir. 1982).[19] Moreover, the informed and volun-

---

**18.** *See also* American Bar Association Standards for Criminal Justice, Standard 4–3.5 (requiring criminal defense counsel with a conflict of interest to disclose his or her independent interest to the defendant "[a]t the earliest feasible opportunity," but not requiring withdrawal).

In arguing that disqualification was necessary in this case, the government also cites DR 5–105(A) and DR 4–101(C)(4). DR 5–105(A), which restricts a conflict-burdened attorney's ability to accept employment with the consent of his clients, applies only to situations in which the conflict arises from representation of two or more clients who have adverse interests. This rule is therefore irrelevant to the present case. DR 4–101(C)(4) permits an attorney to reveal client confidences in order to defend against accusations of wrongful conduct. While this rule may be useful to Kane if the Bar Counsel should decide to pursue appellant's complaint further, and its implications should be explained to appellant before a waiver of Kane's conflict is accepted, it in no way suggests that disqualification was necessary here.

We note that the Code of Professional Responsibility will be relevant to a trial court's determination of whether an attorney should be disqualified in criminal, as well as civil, cases. *E.g., United States v. Agosto*, 675 F.2d 965, 969 (8th Cir.1982). In criminal cases, however, the court's decision must focus on, and be guided by, the defendant's Sixth Amendment rights: both the right to effective assistance and the right to counsel of choice. *See Lewis v. United States*, 430 A.2d 528, 532 (D.C.) (per curiam) (Newman, C.J., dissenting), *cert. denied*, 454

U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *Agosto*, 675 F.2d at 969; *United States v. Curcio (Curcio I)*, 680 F.2d 881, 887 n. 3 (2d Cir.1982); *United States v. Armedo-Sarmiento*, 524 F.2d 591, 592–93 (2d Cir.1975); *see also In re Special Investigation No. 231*, 295 Md. 366, 374, 455 A.2d 442, 446 (1983) ("The Code of Professional Responsibility is established for the guidance of the legal profession and for the protection of the public. It is not intended, however, to be a tool which a prosecutor may convert into a sword for the purpose of thwarting one of the most precious of our constitutional rights, that of being represented by counsel of one's choice.").

**19.** Some courts have recommended that the defendant be given an opportunity to confer with independent, outside counsel before such a waiver is accepted by the court. *See, e.g., Curcio I*, 680 F.2d at 890. Although this practice may not always be a prerequisite to a knowing and intelligent waiver, we believe that it will frequently be a valuable means of ensuring that the defendant is acting "with his eyes open." *Adams*, 317 U.S. at 279, 63 S.Ct. at 242.

Additionally, the trial court must take whatever steps are necessary to ensure that the defendant is competent to appreciate the importance of the particular right surrendered and the gravity of the waiver decision. *See Westbrook v. Arizona*, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966) (per curiam); *Frendak v. United States*, 408 A.2d 364, 379–80 (D.C.1979).

tary character of the waiver should be manifested by " 'clear, unequivocal, and unambiguous language.' " *United States v. Garcia,* 517 F.2d 272, 278 (5th Cir.1975) (quoting *National Equipment Rental v. Szukhent,* 375 U.S. 311, 332, 84 S.Ct. 411, 423, 11 L.Ed.2d 354 (1964) ).

Because an effective waiver of conflict-free counsel would have barred any subsequent Sixth Amendment claim based on Kane's conflict of interest, as well as eliminated any concern that appellant was forced to accept less than adequate representation, it was a reasonable alternative to a mistrial which the court should have explored once appellant indicated a desire to continue the trial with Kane's assistance.[20]

■ Judge Hannon's comments at the time of mistrial, however, make clear that he never gave serious consideration to the waiver alternative. Without inquiring into appellant's competence to waive effective assistance of counsel, and without exploring the specific nature of the negative effects he believed the conflict might have on Kane's performance during the remainder of trial, Judge Hannon concluded: "I have no alternative, sir. I have no options in the matter; and that's all there is to that." Judge Hannon either overlooked the need to consider the waiver alternative or erroneously assumed that such a waiver was

impossible as a matter of law and accordingly dismissed this alternative out of hand.

Whichever was the case, the inference of a lack of sound discretion is even stronger here than in cases where the trial court is merely silent regarding a possible, less drastic alternative. *See supra* note 11. The trial court, in this case, admitted its failure to consider any alternative to a mistrial, and yet we can see from the record that at least one possible alternative indeed existed.[21] Under these circumstances, we owe no deference to the trial court in evaluating whether the waiver alternative should have been adopted. *See supra* pages 133–134. We therefore may permit a retrial only if the record reveals a clear and persuasive reason why rejection of that alternative was appropriate on the particular facts presented.

### C. *Constitutional Right to Counsel of Choice; Relationship to Waiver of Effective Assistance of Counsel*

We next must address the government's contention that appellant could not waive his right to conflict-free counsel, given the facts of this case. The government argues that the conflict of interest created by Bar Counsel's investigation so threatened appellant's Sixth Amendment right to effec-

---

**20.** There may be occasions when the trial court perceives a client-attorney conflict, indicates an inclination to declare a mistrial for that reason, and—unlike the present case—does not receive resistance from client or attorney. Questions may arise as to whether there is consent to the mistrial, or whether informed consent is impossible absent a trial court inquiry into whether the defendant wishes a mistrial or wishes to proceed waiving conflict-free counsel. We need not address these questions here.

**21.** There may have been another reasonable alternative to a mistrial. Appellant's complaint to Bar Counsel about Kane, facilitated by Judge Scott, pertained to pretrial representation. However, both Judge Scott and Judge Hannon concluded, after inquiries, that Kane did not render ineffective assistance before trial. Therefore, while properly recognizing that his own pretrial ruling did not cure the conflict problem arising from Bar Counsel's inquiry, Judge Hannon nonetheless could have in-

quired—before declaring a mistrial—whether appellant still wished to pursue his complaint to Bar Counsel. If appellant were to have said no, the court could have summoned Bar Counsel to determine whether, under the circumstances, the matter could be closed without delaying the trial. If Bar Counsel were to have agreed, any possible necessity for a mistrial could have been obviated.

Rather than premise this opinion on the possibility that appellant would have withdrawn his complaint against Kane, we have proceeded with the question presented: whether appellant had the right to waive conflict-free counsel at trial while continuing to pursue his grievance about his attorney's pretrial conduct. On this record, it appears that appellant was willing to proceed with a waiver; there is no evidence that he wished to drop his complaint to Bar Counsel, since the issue was not explored.

tive assistance that the trial court would have been required to reject the waiver alternative, even after full consideration, in order to protect "the ends of public justice." *Perez*, 22 U.S. at 580.[22]

■ While the government is correct in pointing out that the trial court has a "serious and weighty responsibility" to safeguard a criminal defendant's constitutional right to legal assistance which "comports with at least the minimum level of competence consistent with our standards of the fair administration of justice," *Monroe*, 389 A.2d at 816 (citing *McMann*, 397 U.S. at 771, 90 S.Ct. at 1449), this is not the only right of constitutional dimension to be considered in determining whether rejection of the waiver alternative is necessary.

■ Unlike the waiver of most constitutional rights,[23] the waiver of a criminal defendant's conflict-free counsel is buttressed by a constitutional right to retain counsel of one's own choice—a right independent of, and sometimes in collision with, one's right to effective assistance of counsel. Accordingly, in determining whether a waiver of the right to conflict-free counsel was a possible alternative to a mistrial here, we must recognize that

> we are dealing not with a garden-variety case of "waiver",... but rather with a conflict of two constitutional rights, to wit, the right of a criminal defendant to be represented by counsel of his own choice and the right of such a defendant

to counsel whose effectiveness is unimpaired by divided loyalty.

*United States v. Curcio (Curcio II)*, 694 F.2d 14, 22 (2d Cir.1982); *see Lewis v. United States*, 430 A.2d 528, 532–33 (D.C.) (per curiam) (Newman, C.J., dissenting), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). In order to resolve the conflict between these two rights, it is necessary to explore more fully the origins and the nature of the right to be represented by counsel of choice.

■ Many courts have recognized that the right to retain counsel of choice deserves constitutional protection. *Harling v. United States*, 387 A.2d 1101, 1104 (D.C. 1978) (citing *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932) ); *see, e.g., United States v. Agosto*, 675 F.2d 965, 969 (8th Cir.1982); *Linton v. Perini*, 656 F.2d 207, 209–11 (6th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982); *United States v. Laura*, 607 F.2d 52, 56–57 (3d Cir.1979); *United States v. Burton*, 189 U.S.App.D.C. 327, 332, 584 F.2d 485, 490 (1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979); *United States v. Dinitz*, 538 F.2d 1214, 1219 (5th Cir.1976) (en banc), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977); *United States v. Gaines*, 529 F.2d 1038, 1043 (7th Cir.1976); *United States v. Armedo-Sarmiento*, 524 F.2d 591, 592 (2d Cir.1975); *United States v. Inman*, 483 F.2d 738, 739–40 (4th Cir.

---

**22.** In addition to arguing that the potential dangers connected with Kane's conflict of interest were too substantial to permit a waiver, the government suggested at oral argument that Judge Hannon may have concluded that appellant was not competent to waive his right to conflict-free counsel. There is little in the record to support this speculation and, in the absence of any indication by the trial court that appellant's competency was a concern, we refuse to conclude that a waiver was properly rejected on that ground. The government also has argued that Kane had discussions with Judge Hannon off the record before a mistrial was declared, and that during these discussions Kane indicated reservations about continuing his representation of appellant. We need note only that the contents of these off-the-record

discussions are not before this court and that Kane unequivocally expressed in open court his desire to continue with the trial.

**23.** Although most constitutional rights may be waived, this does not mean that a person has a right to insist that a court accept such a waiver or that a court accord treatment other than that consistent with the exercise of the right. *See, e.g., Singer v. United States*, 380 U.S. 24, 34–38, 85 S.Ct. 783, 789–791, 13 L.Ed.2d 630 (1965) (ability to waive right to trial by jury does not create right to insist upon nonjury trial). Thus, a trial court decision to reject a waiver of a constitutional right does not ordinarily infringe on any protected interest or give rise to a claim of judicial error. *Id.*

1973), *cert. denied,* 416 U.S. 988, 94 S.Ct. 2394, 40 L.Ed.2d 766 (1974).[24] Courts have looked at two related, but distinct, constitutional norms in formulating the basis for this protection.

Most courts have held that an implied right to choose one's counsel is "part and parcel of the right to the assistance of counsel expressly guaranteed" by the Sixth Amendment. *Curcio II,* 694 F.2d at 26; *see Harling,* 387 A.2d at 1104. These courts have reasoned, more specifically, that in light of the Anglo-American concept of the role of an attorney within our adversarial system of justice—*i.e.,* attorneys serve as the "personal agents" of litigants, *Faretta,* 422 U.S. at 820 n. 16, 95 S.Ct. at 2534 n. 16, not as agents of the state—an implied right to select counsel free from undue interference by the court is an essential corollary of the express right to the assistance of counsel under the Sixth Amendment.

A number of courts have recognized, in addition, that the right to counsel of choice is embodied within the more general Sixth Amendment due process right of a criminal defendant "to decide, within limits, the type of defense he wishes to mount." *Laura,* 607 F.2d at 56; *see Curcio II,* 694 F.2d at 25; *Garcia,* 517 F.2d at 276–77 n. 3. Both the Supreme Court and this court have recognized "the importance of permitting a defendant to make decisions central to the defense," *Frendak v. United States,* 408 A.2d 364, 375 (D.C.1979); *see Faretta,* 422 U.S. at 818–35, 95 S.Ct. at 2532–41.[25] We find this constitutional basis for the right to counsel of choice to be particularly informative in determining whether a defend-

ant may insist on waiving the right to conflict-free counsel.

In *Faretta,* the Supreme Court held that the Sixth Amendment contains an implied constitutional right to waive the assistance of counsel and to insist upon self-representation at trial. In discerning this right, the Court first looked to the plain language and the structure of the Sixth Amendment and concluded: "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." 422 U.S. at 819, 95 S.Ct. at 2533. Simply put, "[t]he right to defend is personal." *Id.* at 834, 95 S.Ct. at 2540–41. Given this underlying constitutional concern for a defendant's right to control the defense personally, the Court held that the right to dispense with trial counsel and to represent oneself follows naturally. Although the right to self-representation is not literally expressed in the language of the Constitution, it is among those rights which are "essential to due process of law in a fair adversary process" and is therefore properly accorded constitutional status. *Id.* at 819 & n. 15, 95 S.Ct. 2533 & n. 15.

The Court in *Faretta* was careful to stress that it in no way intended to diminish the importance of the Sixth Amendment right to counsel, *id.* at 832–33, 95 S.Ct. at 2539–40, but instead was motivated by a firm conviction that the defendant—who, after all, "will bear the personal consequences of a conviction"—must be "free personally to decide whether in his particular case counsel is to his advantage." *Id.* at 834, 95 S.Ct. at 2541. "[W]hatever else

---

**24.** In addition to protecting a criminal defendant's right to select and hire counsel of choice, this right protects an indigent defendant's right not to have appointed counsel arbitrarily removed "once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established." *Harling,* 387 A.2d at 1105; *see Morris v. Slappy,* 461 U.S. 1, 16, 23, 103 S.Ct. 1610, 1618, 1622, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring); *Smith v. Superior Court,* 68 Cal.2d 547, 562, 440 P.2d 65, 75, 68 Cal.Rptr. 1, 11 (1968).

**25.** *See also Brooks v. Tennessee,* 406 U.S. 605, 612–13, 92 S.Ct. 1891, 1895–96, 32 L.Ed.2d 358 (1972) (state rule requiring criminal defendants either to testify at outset of defense case or to refrain from testifying altogether violates due process because it restricts a defendant's ability to plan the defense case, interferes with an important tactical trial decision, and prevents a defendant from exercising control over the timing of a "critical element" of the defense).

may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice." *Id.* at 833–34, 95 S.Ct. at 2540 (footnote omitted). Moreover, even though the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 834, 95 S.Ct. at 2541 (quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064–65, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)).

 In *Frendak,* this court recognized that the teachings of *Faretta* have logical and compelling implications that reach beyond the context of the Sixth Amendment right to self-representation. *Frendak* required a trial court to accept a competent defendant's knowing and intelligent waiver of the insanity defense, "holding that respect for a defendant's freedom as a person mandates that he or she be permitted to make fundamental decisions about the course of the proceedings." 408 A.2d at 376. This holding, like that in *Faretta,* reflects both a desire to avoid a rigidly paternalistic attitude toward a competent defendant's ability to determine his or her own best interests,[26] and an abiding respect for the individual dignity and free will of an accused that exists irrespective of whether the accused is likely to act so as to further the chances of an acquittal. *See* 408 A.2d at 376–78. *Frendak* therefore stands for the proposition that, at least under certain circumstances, a defendant's

interest in controlling important defense decisions may outweigh society's interest in promoting "some abstract concept of justice" by ensuring that a defendant enjoys the full panoply of defense-oriented constitutional rights. 408 A.2d at 378.

 Because the selection of an attorney is often "the most important decision a defendant makes in shaping his defense," *Laura,* 607 F.2d at 56,[27] we conclude that a defendant's choice of counsel is among the fundamental defense decisions constitutionally protected under *Faretta* and *Frendak.* This means that the constitutional status accorded the right to counsel of choice derives both from the Sixth Amendment right to assistance of counsel, *see Harling,* 387 A.2d at 1104, and from the right to make decisions central to the defense which is inherent in the structure of the Sixth Amendment and in our notions of due process under the Fifth Amendment.

 The right to be represented by counsel of choice, however, is not absolute. Although a defendant's decision "to place his liberty and possibly his life in the hands of an attorney of his choice may not be lightly tampered with," *Laura,* 607 F.2d at 53, such a decision may be overridden in certain limited situations. *See id.; United States v. Shepard,* 675 F.2d 977, 980 (8th Cir.1982); *United States v. Cunningham,* 672 F.2d 1064, 1070 (2d Cir.1982). Nonetheless, two types of restrictions substantially limit a trial court's discretion to disqualify a defendant's chosen counsel.

**26.** *Cf. Michigan v. Mosley,* 423 U.S. 96, 108–09, 96 S.Ct. 321, 328–29, 46 L.Ed.2d 313 (1975) (White, J., concurring) ("unless an individual is incompetent, we have in the past rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case. [Citing *Faretta.*] To do so would be to 'imprison a man in his privileges.'") (footnote omitted) (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 280, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)).

**27.** *See Laura,* 607 F.2d at 56:
 We would reject reality if we were to suggest that lawyers are a homogeneous group.

Attorneys are not fungible, as are eggs, apples and oranges. Attorneys may differ as to their trial strategy, their oratory style, or the importance they give to particular legal issues. These differences, all within the range of effective and competent advocacy, may be important in the development of a defense. It is generally the defendant's right to make a choice from the available counsel in the development of his defense. Given this reality, a defendant's decision to select a particular attorney becomes critical to the type of defense he will make and thus falls within the ambit of the sixth amendment.

 First, there are procedural restrictions on a trial court's power to interfere with a defendant's selection of counsel. Before denying a defendant's request to waive effective assistance and proceed with representation by chosen counsel, a trial court ordinarily must "hold a hearing to assess the extent of the attorney's ethical violation, the disruption or delay to courtroom procedures caused by unqualified representation, and whether the defendant's attempted waiver is made knowingly and intelligently." *Lewis*, 430 A.2d at 531 (citations omitted); *see Morris v. Slappy*, 461 U.S. 1, 25, 103 S.Ct. 1610, 1623, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring) (trial court has obligation to inquire into possible means of accommodating defendant's choice of counsel). Although a hearing may be dispensed with in certain rare cases, *see Lewis*, 430 A.2d at 531, a decision to reject a defendant's chosen counsel without findings or reasoned support will generally constitute error. *See, e.g., Laura*, 607 F.2d at 57–58.[28]

 Second, a trial court decision denying a defendant representation by counsel of choice will be proper only if motivated by certain legitimate concerns:

"[t]he only limitation that may be placed on the right to retained counsel of choice is that the client's selection not impede or disrupt the orderly administration of justice." *Harling*, 387 A.2d at 1104 (citation omitted); *see United States v. Poulack*, 556 F.2d 83, 86 (1st Cir.) ("the right of an accused to choose his own counsel cannot be insisted upon in a manner that will obstruct reasonable and orderly court procedure"), *cert. denied*, 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977). Under this guideline, a court need not permit representation by a person who is not properly qualified to practice before it,[29] or by a qualified attorney whose conduct threatens to disrupt the orderly progress of the trial.[30] Nor does a court necessarily abuse its discretion by refusing to interrupt a trial or grant a motion for continuance to facilitate a defendant's choice of counsel.[31] Also, "the orderly administration of justice" may require that an attorney be disqualified to protect the legitimate interests of some person or party other than the defendant. For instance, a defendant's interest in retaining a particular attorney may be outweighed ·by the interests of one of that attorney's former clients who seeks dis-

**28.** Because of the context in which the question arises in this case, we express no view as to the degree of prejudice that must be shown, if any, when a defendant first raises the issue of an erroneous denial of the right to counsel of choice in a post-conviction appeal.

**29.** *E.g., United States v. Wilhelm*, 570 F.2d 461, 466 (3d Cir.1978) (defendant is not entitled to be represented by a lay person); *United States v. Grismore*, 546 F.2d 844, 847 (10th Cir.1976) (court may exclude disbarred attorney from practicing before it).

**30.** *See, e.g., Wright v. United States*, 365 A.2d 365 (D.C.1976) (defense attorney's lack of preparation for trial and improper remark before jury justified mistrial to appoint new counsel); *United States v. Dinitz*, 538 F.2d 1214, 1219–24 (5th Cir.1976) (repeated instances of disruptive conduct warranted removal of defense attorney from case), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977).

**31.** *E.g., Lewis v. United States*, 430 A.2d 528, 529–31 (D.C.1981) (per curiam) (trial court did not err in denying continuance, after trial com-

menced, in order to allow defendant to replace his present attorney with counsel who was totally unfamiliar with the case and suffering from a physical affliction that would have seriously impaired his ability to function at trial); *Giacalone v. Lucas*, 445 F.2d 1238, 1240–44 (6th Cir.1971) (pretrial denial of request for indefinite continuance to accommodate medical problems of chosen counsel not improper where such counsel's associate was prepared to go forward with trial), *cert. denied*, 405 U.S. 922, 92 S.Ct. 960, 30 L.Ed.2d 793 (1972); *United States v. Grow*, 394 F.2d 182, 210 (4th Cir.) (right to choose counsel does not permit defendant "to obtain a delay at his whim and caprice"), *cert. denied*, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968). A trial court's failure to take measures to allow a defendant to continue at trial with his retained counsel may, however, under other circumstances constitute reversible error. *See Gandy v. Alabama*, 569 F.2d 1318, 1323–38 (5th Cir. 1978); *Releford v. United States*, 288 F.2d 298, 299–302 (9th Cir.1961).

qualification to prevent the misuse or disclosure of confidential information.[32]

■ A trial court, however, should not interfere with a defendant's choice of counsel solely for the purpose of protecting the defendant's right to effective assistance of counsel—even when effective assistance is threatened by a conflict of interest. If the right to counsel of choice conflicts with the right of an attorney of undivided loyalty, the choice as to which right shall take precedence must be left to the defendant, properly informed of that choice. *Cunningham,* 672 F.2d at 1073; *see Curcio II,* 694 F.2d at 22, 25; *Curcio I,* 680 F.2d at 888; *Garcia,* 517 F.2d at 276–77; *see also Agosto,* 675 F.2d at 976 (although court questioned the advisability of defendant's choice of a counsel burdened by a conflict of interest, it reasoned that defendant was

"fully capable of making that choice"; therefore waiver should not be rejected absent "adequate reason").[33] Thus, as long as the conflict of interest will not impede the smooth progress of the trial, adversely affect the legitimate interests of third parties, or otherwise "disrupt the orderly administration of justice," *Harling,* 387 A.2d at 1104, a trial court should not force a competent defendant to forego representation by counsel of choice, even when disqualification would further the court's perception of the defendant's best interest.[34] A contrary holding would be patronizing toward defendants and would rob them of their right to choose freely how to present themselves before the law. Not only would it subvert the principles of *Faretta* and *Frendak,* which underlie the right to counsel of choice, it would also stand the Sixth Amendment right to effective assist-

**32.** *E.g., Agosto,* 675 F.2d at 971, 974–76; *United States v. Ostrer,* 597 F.2d 337, 341 (2d Cir.1979); *United States v. Kitchin,* 592 F.2d 900, 903–04 (5th Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979); *United States v. Kaufman,* 429 F.2d 240, 247 (2d Cir.), *cert. denied,* 400 U.S. 925, 91 S.Ct. 185, 27 L.Ed.2d 184 (1970). The trial court should, of course, make every effort in such a case to accommodate the interests of both the former client and the defendant, if possible. *Cunningham,* 672 F.2d at 1071.

In addition to the reasons for permitting disqualification of chosen counsel discussed in the text, it has been consistently held that a trial court enjoys wide latitude in appointing counsel for indigent defendants. *E.g., United States v. Davis,* 604 F.2d 474, 478–79 (7th Cir.1979); *see generally* Annot., 66 A.L.R.3d 996 (1975). Once a valid appointment is made and an attorney-client relationship has been established, however, an indigent defendant has precisely the same right to insist upon continued representation as does a defendant who retains counsel. *Harling,* 387 A.2d at 1105.

**33.** We recognize that the Third Circuit has adopted an approach to this problem giving the trial court greater discretion—and, consequently, the defendant less discretion—in deciding which of these two rights will predominate when a defendant chooses to be represented by counsel who has a conflict of interest. *See United States v. Flanagan,* 679 F.2d 1072, 1075–76 (3d Cir.1982), *rev'd on other grounds,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); *United States v. Dolan,* 570 F.2d 1177, 1180–84 (3d Cir.1978). We first note that these cases

involved attempts to waive the right to conflict-free counsel that were brought to the attention of the trial court and ruled on pretrial; they therefore did not consider the independent limitations placed on a trial court's discretion by the double jeopardy clause and its requirement of "manifest necessity." Second, to the extent these cases suggest that a trial court may override a competent defendant's informed choice of counsel based solely on the court's determination that the defendant's best interests would be served by substituting new counsel, we reject them as contrary to principles of *Faretta* and *Frendak* which underlie the right to counsel of choice.

It is also worth noting that the right to effective assistance and the right to counsel of choice will ordinarily complement each other. In most cases, the defendant will want to have effective assistance of counsel and will gladly acquiesce in the trial court's efforts to replace an incompetent attorney. In those relatively few cases where a defendant has particular reasons for wanting to be represented by counsel with a conflict of interest, the "respect for the integrity of the court" which concerned the Third Circuit in *Flanagan* and *Dolan* will be adequately preserved by the trial court's insistence that the defendant's waiver be fully informed and voluntary.

**34.** *See Curcio II,* 694 F.2d at 22 (government's "appropriate concern" in seeking disqualification of counsel to protect defendant's right to conflict-free representation is limited to "avoiding interruption of the trial and ... obtaining convictions free from appreciable threat of successful attack").

ance on its head by limiting a defendant's ability to make his or her own case at trial. *See Adams*, 317 U.S. at 279, 63 S.Ct. at 242 ("What were contrived as protections for the accused should not be turned into fetters.").

The record in this case provides no support for Judge Hannon's interference with appellant's counsel of choice. Appellant's complaints to Bar Counsel dealt with Kane's efforts to obtain appellant's pretrial release, and Judge Hannon specifically found that Kane's preparation for and performance at trial could not prevent his continued representation. *See supra* note 2. Nor is there evidence that Kane's continued representation of appellant would have disrupted the trial proceeding or threatened the interests of a third party. Moreover, aside from his repeated assertions that the Bar Counsel investigation made Kane's continued representation of appellant impossible, Judge Hannon made no findings and gave no reasoned explanation why a waiver of effective assistance was improper. Under those circumstances, we cannot conclude that the waiver alternative would have been inappropriate.

### IV. SUMMARY

At the time the court declared a mistrial, appellant had developed a significant double jeopardy interest in continuing with the proceeding. Jeopardy had attached with the selection and swearing of the jury; the somewhat unusual defense strategy had been revealed in the opening argument; defense counsel had presented an elaborate cross-examination of one of the government's complaining witnesses, resulting in substantial uncertainty that the witness could identify his assailant; and both appellant and counsel expressed a desire to go forward with trial. The trial court was required to acknowledge this significant double jeopardy interest in deciding whether to declare a mistrial, and was permitted to foreclose appellant's "option to go to the first jury" only after "a scrupulous exercise of judicial discretion." *Jorn*, 400 U.S. at 484–85, 91 S.Ct. at 556–57. The record reveals that this was not done. The trial court declared the mistrial without evincing any concern for the double jeopardy consequences of its actions or for the appellant's constitutional right to counsel of choice, and without giving adequate consideration to the less drastic alternative—waiver of conflict-free counsel—that appears from the record to have been available. Accordingly, the indictment in this case must be dismissed.[35]

*So ordered.*

---

**35.** Basically, our dissenting colleague would sustain Judge Hannon's *sua sponte* declaration of a mistrial, on the ground of manifest necessity, because of a belief that this court should grant greater deference to trial court discretion than we, in the majority, conclude the Constitution permits on the facts of this case. We believe a response is in order.

In the first place, our colleague incorrectly premises his dissent on a perception that the trial court did not altogether act *sua sponte* in declaring the mistrial—a perception that the government itself acknowledges is not true. *See supra* note 3. Put another way, our colleague apparently believes that this case falls somewhere in between a defense request for a mistrial and manifest necessity for a mistrial over defense objection, with authority in the trial court to declare a mistrial under such circumstances. The dissent cites no legal authority recognizing such a hybrid situation, and in any event there is no basis in the facts for such a perception. Even if attorney Kane, in disclosing his conflict to the court in chambers before the second day of trial, had asked to withdraw as counsel, *but see supra* note 22, the fact remains—as the dissent acknowledges—that appellant thereafter asked unequivocally, in open court, to continue the trial with Kane as his attorney, and Kane unquestionably acceded to that request. The dissent is plainly wrong to imply that appellant and Kane eventually backed away from that position. In short, this is not in any respect a case of defense acquiescence in a mistrial. On this record, the only justification for a mistrial would have to be manifest necessity over defense objection. As we elaborate in our opinion, however, there was no manifest necessity absent trial court consideration of appellant's right to waive conflict-free counsel.

Second, the dissent says that, in any event, appellant could not have waived conflict-free counsel on the facts here. We disagree. We have elaborated why the trial court was obliged to explore that option under the circumstances

BELSON, Associate Judge, dissenting:

To use his words, defense counsel found himself "in an adversary relationship with Mr. Douglas (his client) and ... also in an adversary relationship due to the gravamen of the complaint against [him] by Mrs. Douglas (his client's mother) because she, in fact, paid the fee." Counsel added "it seems to me I'd also be in a conflict of interest." Counsel made those statements during a hearing held on the second day of what was to have been a lengthy trial. The hearing was held for the purpose of determining how to resolve the problems that defense counsel had brought urgently to the attention of the court upon his learning that his client had lodged a written complaint against him with Bar Counsel over the manner in which counsel was handling the very case on trial. The trial judge, appreciating that defendant's complaint against retained counsel had burdened counsel with a serious conflict of interest, declared a mistrial. I think he acted within his discretion in doing so. Therefore I dissent.

A few observations about the facts are in order. The problem that led to the mistrial was not raised, *sua sponte*, by the trial judge. Instead, it was raised by defense counsel, Mr. Kane, who requested a meeting with the judge in his chambers before the commencement of the second day of trial. The Assistant United States Attorney was invited to attend, and did so. While no court reporter was present, the unchallenged statement of the prosecutor a short time later in open court was that defense counsel had moved in chambers to withdraw from the case. After a brief discussion, the judge and counsel entered the courtroom and, in the presence of the defendant, the judge stated the problem for the record. After doing so, the judge said that he had a "pretty strong notion myself regarding what's required," but asked defense counsel to address the matter. Counsel said "I wouldn't want to have a hearing per se; but I would like to have my client make a statement exactly what his position is vis a vis myself, both my client and his mother."

Defendant discussed the background of the matter and said that he "would like to keep Mr. Kane" as defense counsel, "and continue this trial." The trial judge replied that defendant could not keep Mr. Kane so long as the matter was pending before Bar Counsel. After further colloquy, Mr. Kane stated his position as follows: "As the court pointed out, I'm involved in an adversary proceeding with my client. At the same time my client indicates he wants me

---

presented. We simply add that the dissent, in discounting the waiver option, relies on cases that are inapposite and/or do not address the constitutional considerations that should inform the analysis. See *supra* notes 31 and 33, discussing *Lewis v. United States*, 430 A.2d 528 (D.C.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *United States v. Flanagan*, 679 F.2d 1072 (3d Cir.1982), *rev'd on other grounds*, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); *United States v. Dolan*, 570 F.2d 1177, 1178 (3d Cir.1978).

Finally, the dissent pays lip service to a defendant's double jeopardy interests. *See post* at 148 n. 3. To prevent a mistrial, appellant was not required, as the dissent implies, to prove that the policy reasons underlying this Fifth Amendment right were, in any or all respects, specifically applicable to his case. This constitutional right exists to protect one against the risk of losing a favorably disposed jury, of lessening prospects for acquittal at a second trial, and of increasing emotional and financial bur-

dens. *See supra* Part II.A. These are risks for the defendant, not for the trial court (or this court), to evaluate. The dissent unfairly minimizes the significance of appellant's expressed desire to continue with the trial. Even though "the trial here had proceeded only through opening statements and the testimony of one witness," *post* at 148 n. 3, we have explained why appellant may have perceived that events during the first full day of trial made it desirable for him to waive conflict-free counsel and proceed to verdict. *See supra* pages 128, 145. By asking to go forward with the trial, appellant preserved the right to have the trial court consider that option.

In sum, the dissent, in emphasizing trial court discretion, does not focus on the critical fact that appellant and Kane unequivocally announced their desire to continue with the trial. Nor does it come to grips with the central legal issues: appellant's double jeopardy interests and his constitutional right to counsel of choice.

to continue in the case. It's my candid desire that, if humanly possible, for the trial to go forward." After Mr. Kane again noted that he was in an adversary relationship and acknowledged the conflict of interest, the trial court informed him that either he could move for a mistrial and have a continuance during which the situation might be resolved, or the court could *sua sponte* declare a mistrial.[1] After a recess during which counsel spoke to his client and his client's mother, Mr. Kane moved for a mistrial. He prefaced his motion for mistrial with the following statement:

First of all, I'd like to thank the Court very much for your kindness in this matter. I deeply appreciate it. I would say, also, my position in this case is such that being in an adversary relationship with both my client and the prosecutorial forces as the result of representing my client, I find it difficult to make a motion because I wonder if, in fact, I have standing to make a motion on behalf of my client. But, if I do have standing to make a motion on behalf of my client, I do so move to have this matter resolved.

Although both Mr. Kane and appellant had earlier expressed a preference for proceeding with trial, neither voiced an objection to the grant of mistrial.

The foregoing facts serve to illustrate the roles played by defense counsel and appellant in the discussions leading up to the mistrial. They show especially the concern defense counsel felt over his status and his ambivalence about the practicality and propriety of his continuing with the trial. With respect to appellant, it is worth adding the specific language of the complaints that he made against his attorney. These complaints were made in writing by

appellant less than a month before the mistrial was declared:

(1) My lawyer has failed to contact me while I have been incarcerated. He only manages to see me on the day of my court appearances.

(2) My lawyer did not seem to be prepared for my bond reduction hearing.

(3) My lawyer calls my mother to tell her about what he has done and when my mother calls the court she finds out that the lawyer's statements are in fact, not true. This has been happening constantly during my six-month incarceration.

(4) My lawyer failed to explain to the judge why the army was taking me away from the court, as a result the court gave me a B.R.A. which increased my bond. The judge was very angry with my lawyer and the result was a much larger bond, which I cannot pay.

(5) Had my lawyer been doing his job with the least bit of competence, I would have been to trial and out of jail, and as his client this is a gross injustice to me. What has he done? I would like to see the work, if he has not prepared this case properly I would like a portion of his fee returned to me; it is only fair since I am paying for services rendered and receiving nothing.

The letter of Bar Counsel that forwarded the complaints to defense counsel instructed counsel that he was required to submit in duplicate a statement setting forth his position within 10 days of the date of the letter, and advising him that he could be represented by counsel of his choice in the matter.

It is also worth referring to the role of the government in bringing about the mistrial. There was none. Indeed, the government had brought Mr. Douglas be-

---

**1.** The court did not include completion of the trial as one of defendant's options, and for that reason the government's brief concedes that the court's action in declaring a mistrial should be deemed to have been taken *sua sponte*. That concession does not preclude us from considering in our "manifest necessity" analysis that defense counsel initiated the discussion, moved

in chambers to withdraw and acknowledged both his adversary relationship with his client and his conflict of interest. *See United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824) (Story, J.) (court considers all the circumstances to determine manifest necessity for mistrial); *Wade v. Hunter*, 336 U.S. 684, 689–90, 69 S.Ct. 834, 837–38, 93 L.Ed. 974 (1949) (same).

fore the court for trial on the charges against him, except the Bail Reform Act violation, on Friday, September 5, 1980, almost a year before the mistrial in question here. The jury was selected but not sworn. Appellant was returned over the weekend into the third-party custody of his parents. He absconded rather than reappearing for trial and a bench warrant issued on September 8. The following day the jury was discharged. After the bench warrant for appellant's arrest was executed, the government again prepared for trial and the trial was proceeding as described above until appellant's complaints concerning his defense counsel were brought to the attention of the court.[2]

The majority opinion is especially critical of the trial judge for having failed to consider, as an alternative to mistrial, giving the defendant an opportunity to waive his right to independent counsel and to go forward with Mr. Kane despite their conflict of interest and adversary relationship.[3] [majority opinion at 139 et seq.] The majority concludes that "Judge Hannon either overlooked the need to consider the waiver alternative or erroneously assumed that such a waiver was impossible as a matter of law and accordingly dismissed this alternative out of hand." [majority, supra, at 139] Asserting that the trial court admitted its failure to consider any alternative when at least one possible alternative existed, the majority concludes that "we owe no deference to the trial court in evaluating whether the waiver alternative should have been adopted."[4] Id., at 139.

I disagree entirely that we can say fairly that the trial judge failed to exercise discretion in his determination of the necessity of a mistrial simply because he was quick to size up the stark nature of counsel's actual conflict of interest and acted decisively after hearing from counsel in chambers and

2. Where mistrial is declared because of the conduct of the government, for example, in not being able to go forward with its case, we apply strict scrutiny to the decision to declare a mistrial. Arizona v. Washington, 434 U.S. 497, 508, 98 S.Ct. 824, 831, 54 L.Ed.2d 717 (1978); Routh v. United States, 483 A.2d 638, 642, 645 (D.C. 1984). This is not such a case. To the contrary, since the mistrial was declared for the benefit of defendant, a deferential review is appropriate. United States v. Sedgwick, 345 A.2d 465, 470–71 (D.C.1975) (discussing Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961), United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), and Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973)), cert. denied, 425 U.S. 966, 96 S.Ct. 1751, 48 L.Ed.2d 210 (1976).

3. The majority also invokes three policy reasons to support reversal. On analysis, they furnish little support for that result. The first is the defendant's right to conclude the trial before a jury he believes to be favorably disposed toward him. Neither defendant nor his counsel expressed the view that the jury was so disposed. The majority also indicates that this interest intensifies as the trial proceeds. But the trial here had proceeded only through opening statements and the testimony of one witness.

The second policy reason stated is that prospects for acquittal may be lessened upon retrial. There is no real indication in the record that the government would benefit any more than the defense from having heard one another's opening statements and examining the first witness. The defense gained discovery of that witness' testimony. The government may or may not have profited by the reference to a frame up in the defense counsel's opening statement. It is, in any event, entirely clear that the government did not seek to provoke a mistrial to gain any such advantage.

The third policy consideration is derived from the increased financial and emotional burden upon defendant, and the prolonging of the period of his stigmatization as an accused. In this case, the defendant caused considerable prolongation of his status as an accused by fleeing his first trial. He demonstrated little interest in lifting any emotional burden the charges imposed on him. His flight resulted directly in the financial burden imposed by his incarceration.

4. The majority opinion states that at no time did the trial judge evince a concern for the double jeopardy consequences of a mistrial. (pp. 135–145) The opinion also states that the trial judge never referred to the appellant's constitutionally protected interest in having the trial concluded before the jury that was already impaneled. Those statements are unwarranted for two reasons. The first is that we can safely assume that the trial judge was well aware of these elementary concepts. Secondly, in his colloquy with counsel and the defendant before ordering the mistrial, the judge adverted to the fact that the jury had been sworn, and the trial had begun.

discussing the matter at some length on the record. It is not difficult to hypothesize many other examples of conflicts so serious that they would lead a trial judge to conclude correctly that they warrant a mistrial even in the face of appellant's willingness to waive them.[5] The majority's analysis apparently proceeds from the view that if the defendant, having been adequately informed of relevant considerations, knowingly and intelligently had waived the conflict of interest, that would have concluded the matter—the trial judge would have had to accede to defendant's waiver. The majority seems to take the view that if the trial judge could not have been reversed on appeal for having accepted the waiver, it follows that he was required to accept it. I think that premise is faulty.

In my view, the gravity of the conflict of interest and its subtlety warranted the trial judge's action. While it might have been difficult to explain effectively to a defendant, it was undoubtedly obvious at once to the trial judge that a conflict of the type involved here would alter the relationship between counsel and client and could lead in varied and unpredictable ways to changes in the manner in which defense counsel would conduct the trial. It could affect the openness of communications between counsel and client. It could lead counsel to try to make a record which would protect counsel rather than vindicate his client. Even if his client would have withdrawn his charges, counsel could well have anticipated that a client who had made and withdrawn such charges before would make them again.

The majority states that "[i]f the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choice as to which right shall take precedence must be left to the defendant, properly informed of that choice." [majority, *supra*, at 144]

I disagree. This court has previously held that a "trial court need not accept the defendant's attempt to waive his right to a counsel who is free of ethical violations." *Lewis v. United States*, 430 A.2d 528, 530 (D.C.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). In *Lewis*, we affirmed a trial court's restriction of a defendant's choice of counsel, without a hearing, because it was "apparent ... on the facts of this case, [that] the trial judge could reasonably conclude without a formal inquiry that [counsel] would be unable to surmount his violation of the ... ethical precepts [adequate preparation and competency] ..." *Id.* at 531. We recognized in *Lewis* that although the trial court normally would conduct a hearing to assess the ethical violation, disruptive effect, and offered waiver, in some circumstances the court may restrict without a hearing the defendant's right to a particular attorney in view of "the court's obligation to protect defendants from their chosen attorney's violation of ethical rules designed to protect the defendant." *Id.* at 530.

Similarly in *United States v. Dolan*, 570 F.2d 1177 (3d Cir.1978), the United States Court of Appeals for the Third Circuit held that a trial court is not required to accede to a waiver of a conflict of interest when faced with an actual, as distinguished from potential, conflict on the part of an attorney representing two codefendants. Again, in *United States v. Flanagan*, 679 F.2d 1072 (3d Cir.1982), *rev'd on other grounds*, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984),[6] the Third Circuit stated as follows:

the appellate court lacked jurisdiction over a pretrial disqualification of defense counsel in a criminal prosecution because such an appeal is not within the narrow collateral order exception. 465 U.S. 259, 104 S.Ct. 1051, 1055–56, 79 L.Ed.2d 288. On remand from the Supreme Court, the Third Circuit dismissed the appeal. 730 F.2d 945 (3d Cir.1984). Although the opin-

---

**5.** For example, in the listing of conflict situations set forth in *United States v. Hurt*, 177 U.S.App.D.C. 15, 19 n. 21, 543 F.2d 162, 166 n. 21 (1976), the court refers to a defense counsel who, in a separate civil proceeding, was representing his client's victim.

**6.** The Supreme Court reversed the Third Circuit's decision in *Flanagan* on the ground that

It does not follow, however, that because defendants may waive the right to separate representation free from potential conflicts, they have an absolute right, constitutional or otherwise, to have such waivers accepted by a court. A truly knowing and intelligent waiver accepted by the court will insulate a conviction from later attack. But the perspective of a trial court judge need not be limited to a concern not to have a conviction overturned.

*Id.* at 1076 (footnote omitted). Referring to its earlier opinion in *Dolan, supra,* the court added: "In addition to the trial judge's interest in being free from post-conviction attacks, we mentioned the court's concerns about breaches of professional ethics and about respect for the integrity of the court." *Id.* at 1076 (footnote omitted). *See also United States v. Helton,* 471 F.Supp. 397, 401 (S.D.N.Y.1979) (conflict too strong to permit waiver). Such considerations are not limited to situations where a single attorney represents multiple codefendants. *Hurt, supra,* 177 U.S.App.D.C. at 19, 543 F.2d at 166.

The above holdings do not deal with double jeopardy claims. Nevertheless, their recognition that a trial judge may reject proffered waivers of conflicts of interest is at odds with the majority's conclusion that acceptance of an intelligent and informed

waiver by appellant would have been obligatory. The trial judge in this case was faced not with a potential conflict of interest but with a serious actual conflict of interest. In my view, if appellant had offered to waive the conflict after further hearing, the trial judge would not have been required to accept it. Rather, he acted within his discretion in concluding that the circumstances necessitated mistrial. *See United States v. Perez* and *Wade v. Hunter, supra,* note 1.[7]

The sum of the situation before us is this. The people are being deprived of their day in court on the charges against appellant. They are being thus deprived first by reason of appellant's abscondance from his first trial and secondly because the differences between appellant and his counsel at the time of the second trial led the trial judge to declare the mistrial that the majority deems erroneous. I respectfully dissent. The precedents do not call for what is, in an almost literal sense, a miscarriage of justice.

ion reported at 679 F.2d 1072 lacks precedential value, the reasoning on the nonjurisdictional waiver issue is helpful.

**7.** I think it would be requiring too much of the trial judge to ask that he would have thought of and pursued whatever possibility there was that Bar Counsel might have been in a position to

come to the courthouse and, upon appellant's withdrawal of his complaint, close the proceedings against defense counsel. It is by no means certain that Bar Counsel would have taken such action, or indeed would have been available promptly to attend at court to do so. [majority, *supra,* at 139 n. 21]